UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ARVEL MARSHALL,

                          Plaintiff,

    – against –

THE CITY OF NEW YORK, JAY WOLSKY,
MATTHEW HUTCHISON, WILLIAM
WINNING, MICHAEL A. BENNETT, PETER C.
CANNIZARO, former DA CHARLES HYNES
(official capacity) and JOHN AND JANE DOES 1-
25.

Case No.

**<u>COMPLAINT</u>**
JURY TRIAL DEMANDED

**JUSTIN C. BONUS ATTORNEY AT LAW**

Justin Bonus, Esq.
118-35 Queens Blvd, Suite 400
Forest Hills, New York 11375
(347) 920-0160 (Tel)
(917) 475-0682 (Fax)
Justin.bonus@gmail.com
*Attorneys for Plaintiff Arvel Marshall*

# TABLE OF CONTENTS

INTRODUCTION....................................................................................................................1

NATURE OF THE ACTION ................................................................................................5

JURISDICTION AND VENUE.............................................................................................6

CONDITIONS PRECEDENT ...............................................................................................7

PARTIES..................................................................................................................................7

JURY DEMAND...................................................................................................................10

FACTS ...................................................................................................................................10

A. The Crime and Arvel Marshall's Innocence .................................................................10

B. The Investigation ............................................................................................................. 11

C. *Wade* Hearing...................................................................................................................18

D. The Trial and Wrongful Conviction .............................................................................. 21

E. The Joint Reinvestigation ............................................................................................... 32

F. The Joint Motion to Vacate and Trial Court's Decision .............................................. 39

G. The City of New York's Deliberate Indifference to Police and Prosecutorial
   Misconduct, and Its Failure to Train, Supervise, and Discipline Its Employees..................................... 40

   DAMAGES....................................................................................................................... 58

   CAUSES OF ACTION .................................................................................................... 59

   FIRST CAUSE OF ACTION
   42 U.S.C. § 1983: Denial of Due Process and Right to a Fair Trial,
   Fabrication of Evidence, and Suppression of *Brady* Information.............................................. 59

   SECOND CAUSE OF ACTION
   42 U.S.C. § 1983: Malicious Prosecution and Denial of Fourth Amendment Rights ........................... 61

   THIRD CAUSE OF ACTION
   42 U.S.C. § 1983: *Monell* Claim ................................................................................. 63

   FOURTH CAUSE OF ACTION
   New York State Law: Malicious Prosecution ................................................................... 66

   FIFTH CAUSE OF ACTION
   New York State Constitution: Denial of Due Process and Right to a Fair Trial, Fabrication of
   Evidence, Suppression of Exculpatory Information, and
   Malicious Prosecution...................................................................................................... 67

   SIXTH CAUSE OF ACTION
   New York State Law: Negligence .................................................................................... 68

   REQUEST FOR RELIEF ................................................................................................ 69

Plaintiff Arvel Marshall, by his undersigned counsel, the Justin C Bonus Attorney at Law, as and for his complaint against the above-named Defendants, alleges as follows:

## INTRODUCTION

1.      Mr. Marshall brings this action under 42 U.S.C. § 1983 and New York State law, seeking to recover damages caused by the denial of his constitutional and legal rights and his resulting wrongful conviction and loss of liberty.

2.      In July 22, 2008, the New York City Police Department (the "NYPD") arrested Mr. Marshall for the murder of Moustapha Oumaria—a crime of which Mr. Marshall was innocent.  A judgment of conviction was entered against Mr. Marshall on January 5, 2010 after he was wrongfully convicted of one count murder in the second degree.  Mr. Marshall was sentenced to 25 years to life.  He began serving the sentence immediately.  He spent approximately 16 years in prison for a crime he did not commit.

3.      Mr. Marshall had no involvement in the murder of Oumaria.  At the time of the crime, Mr. Marshall was leaving his mother's home in Brownsville by bus, over two miles from the scene of the crime.

4.      Mr. Marshall was exonerated on August 9, 2024 after the Kings County District Attorney's Office's (the "KCDA") Conviction Review Unit (the "CRU") reinvestigated the case and determined that Mr. Marshall was wrongfully convicted.

5.      As the reinvestigation showed, Mr. Marshall's wrongful conviction was the product of government misconduct, including, *inter alia*, the fabrication of a motive of Mr. Marshall to murder Mr. Oumaria, suggestive identifications conducted by defendants Jay Wolsky and Matthew Hutchison, and the suppression and misrepresentation of favorable evidence, to wit, a video that effectively eliminated Arvel Marshall as a suspect in the Oumaria murder.

6.      On August 9, 2024, nearly 15 years after he had been wrongfully convicted, Mr. Marshall and Kings County District Attorney Eric Gonzalez filed a joint motion, under Sections

440.10(1)(g) & (h) of the New York Criminal Procedure Law ("CPL"), to vacate the judgments of conviction on the grounds of newly discovered evidence and *Brady* violations (the "Joint 440 Motion" or "Motion"). Mr. Marshall also moved under actual innocence and the Kings County District Attorney's Office did not oppose.

7.      As District Attorney Gonzalez acknowledged in the CRU's report, the video that the government suppressed pervaded the entirety of the case.

8.      The government's motive was that Mr. Marshall was a scorned lover who gunned down Mr. Oumaria on his own in a fit of rage. The video contradicted this theory completely. The video depicted two perpetrators that calmly walked in the direction of the scene and then, after the shooting, ran quickly away in unison.

9.      Both the NYPD defendant employees and the Kings County District Attorney employees ignored the video evidence and the critical evidence that Janiqua Callier, the woman at the middle of this alleged love triangle had not seen Mr. Oumaria in over 2 months before his death, thereby eliminating this preposterous motive that had no evidentiary support.

10.     Almost immediately after the shooting, witnesses described the shooter as between 5'9" and 6' and somewhere between 17-21. Notably, Arvel Marshall is 5'6" and, at the time of the shooting, was 36 years old. This description effectively eliminated Mr. Marshall.

11.     Instead, the named defendants focused on Arvel Marshall on the basis of a phone call by a man named Abraham Omar who did not even witness the shooting but stated that he believed that "Nikki's" boyfriend was the killer. *See Final Report of the New York State Bar Association's Task Force on Wrongful Convictions*, Pg. 43-44 (April 4, 2009) (Early focus or "tunnel vision" occurs when investigators make a determination before evidence has been reviewed and witnesses have been interviewed.) Moreover, apparently, the NYPD never even confirmed whether this individual existed or where his information came from. Notably, one of the deceased's friends told CRU that no one heard of a man named Omar, let alone the deceased having a friend named Abraham Omar.

12.     Det. Hutchison, the detective who was assisting Det. Jay Wolsky and was the officer who collected the video, admitted that he never watched the entire video. Det. Wolsky reviewed the video and, upon information and belief, mispresented its value. William Winning and Michael A. Bennett reviewed the video and, because of the value of the video, collected the video from its source and provided it to Det. Hutchison. Upon information and belief, both detectives Winning and Bennett misrepresented what the video depicted. PO Peter C. Cannizaro of the Technical Assistance and Response Unit (herein referred to as "TARU"), reviewed the video and provided screen shots to Det. Hutchison. PO Cannizaro misrepresented the value of the video as well.

13.     The trial prosecutor, Timothy Gough, admitted that he never even watched the video and, instead, relied on the representation of Hutchinson.

14.     But there is more. The three witnesses that testified in this case all told the detectives immediately after the shooting that they only had a very brief moment to view the shooter. In fact, witness Zakari told investigators in his first statement that he did not believe he could make an identification. Witness Zibo told investigators that at the time shots were fired he was having a conversation with Benissan. In effect, the investigators were informed that the witnesses could not make an identification by the witnesses' first statements to police.

15.     Yet, both Wolsky and Hutchison conducted suggestive identification procedures with each witness. Witness Te'Te' Benissan admitted that the photo array conducted by Jay Wolsky was suggestive to a defense investigator and when shown a photoarray with Arvel Marshall in it by the same investigator, Benissan could not identify Marshall.

16.     Abdul Zakari admitted to defense investigators that he was unsure if Mr. Marshall was the shooter. Significantly, Mr. Zakari admitted to CRU that he only picked Mr. Marshall as the shooter after he was prompted by either Wolsky or Hutchison. Zakari admitted none of the three men that witnessed the shooting were sure that Mr. Marshall was the shooter when they viewed the identification procedures until they were told that Mr. Marshall was the boyfriend of "Nikki" and was arrested. Not

surprisingly, Zakari testified at trial that Mr. Marshall was not the shooter.

17.     Mr. Marshall was only arrested after three witnesses, whose version of the events were refuted by the video that the government suppressed, identified him in highly suggested identification procedures.

18.     As the CRU found, the failure to turn over the video and the NYPD's failure to investigate the individuals depicted in the video deprived Mr. Marshall of a fair trial. The time passage with regard to the proper evaluation of the video made it impossible for the CRU to reinvestigate this case. The named defendants herein completely failed to investigate the individual shooters on the video and the men that watched these young men walk towards the scene and run away from the scene.

19.     Absent the Defendants' fabrication of evidence and suppression of exculpatory information, Mr. Marshall never would have been convicted.

20.     At an August 9, 2024, hearing on the Joint 440 Motion, the Supreme Court of the State of New York, Kings County (the "Trial Court") granted the Motion and dismissed the indictment against Mr. Marshall.

21.     The following factors, among others, caused Mr. Marshall's wrongful conviction: the misconduct of individual Defendants Jay Wolsky, Matthew Hutchison, William Winning, PO Cannizaro, and Michael Bennett, and John and Jane Does 1-25 (together, "Individual Defendants"); the unlawful failure by Defendant the City of New York (the "City") to prevent its agents' unlawful conduct, including by failing to train, supervise, and discipline its employees; and the City's unlawful policies, customs, and practices that caused violations of the constitutional rights of criminal suspects and defendants, including Mr. Marshall.  Mr. Marshall seeks redress for the official misconduct that caused him to spend over 16 years in prison, and the mental and physical injuries he sustained while incarcerated, as a result of his false and unlawfully procured conviction.

## NATURE OF THE ACTION

22.     This is an action to recover compensatory and punitive damages and an award of costs

and attorneys' fees for violations of Mr. Marshall's rights secured by 42 U.S.C. §§ 1983, 1985, and 1988 and the U.S. Constitution, including its Fourth, Fifth, and Fourteenth Amendments, and under New York State law, due to Defendants' fabrication of evidence to arrest and convict Mr. Marshall for crimes he did not commit and suppression of information that was material to the determination of Mr. Marshall's innocence or guilt. Specifically, Defendants Wolsky and Hutchison conducted suggestive identification procedures that led to Mr. Marshall's erroneous identification. The identification by the witnesses served as the sole basis for Mr. Marshall's arrest, indictment, prosecution, conviction, and over 16 years of wrongful incarceration. Additionally, Individual Defendants violated Mr. Marshall's constitutional rights to due process and a fair trial by withholding exculpatory and other favorable information that would have prevented the wrongful conviction.

23.     The lawsuit also seeks to hold the City liable for constitutional violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The City, through the NYPD and KCDA, maintained unlawful policies, practices, and customs during Mr. Marshall's investigation, arrest, and trial. In executing those unlawful policies, practices, and customs, the City violated the constitutional rights of criminal suspects and defendants, including Mr. Marshall. In Mr. Marshall's case, the unlawful policies, practices, and customs enabled Individual Defendants, as well as other members, servants, employees, and agents of the City, to violate Mr. Marshall's constitutional rights. The policy-making officials acting on behalf of the City were deliberately indifferent to the constitutional violations that those unlawful policies, practices, and customs caused. The City is also liable under New York state law, under the doctrine of *respondeat superior*, for the tortious conduct of its agents and violations of the New York State Constitution. As a result, all Defendants are jointly and severally liable for Mr. Marshall's injuries.

## JURISDICTION AND VENUE

24.     This action is brought under 42 U.S.C. §§ 1983, 1985 and 1988 because Mr. Marshall alleges that he was deprived under color of law of his rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, including by the fabrication of identification evidence by

suggesting that Mr. Marshall was the person arrested for the murder during the identification procedure and the false statements and testimonies of Defendants Wolsky and Hutchison; Mr. Marshall's arrest and prosecution in the absence of probable cause; the suppression of *Brady* information;[1] and the denial of Mr. Marshall's rights to due process and a fair trial.

25.     This Court has original subject matter jurisdiction over Mr. Marshall's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Marshall's constitutional and civil rights, and supplemental jurisdiction over Mr. Marshall's state law claims under 28 U.S.C. § 1367.

26.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391 because Mr. Marshall's claims arose in this District.

## CONDITIONS PRECEDENT

27.     Mr. Marshall has complied with all conditions precedent to the commencement of this action, having timely served on August 9, 2024 a notice of claim upon the Comptroller of the City of New York, under Section 50-i of the New York General Municipal Law; having waited more than 30 days since said service, without these claims having been settled or otherwise resolved; having had a hearing on February 4, 2025, under Section 50-h of the New York General Municipal Law; and having brought this action in a timely manner.

## PARTIES

28.     Plaintiff Arvel Marshall is a citizen of the United States and was, prior to his incarceration, a resident of Kings County in the City and State of New York.

---

[1] All references in this complaint to *Brady* and/or exculpatory information refer to the government's obligation under the Due Process Clauses of the Fifth and Fourteenth Amendments to disclose favorable information to a criminal defendant, and corresponding protections under the New York State Constitution. *See, e.g., Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *Giglio v. United States*, 405 U.S. 150, 155 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wilde v. Wyoming*, 80 S. Ct. 900, 901 (1960); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 335 U.S. 28, 31 (1957); *Berger v. United States*, 295 U.S. 78, 88 (1935); *Poventud v. City of New York*, 750 F.3d 121, 133-36 (2d Cir. 2014); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 137 (2d Cir. 1964); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 570-71 (2d Cir. 1961); *United States v. Zborowski*, 271 F.2d 661, 668 (2d Cir. 1959).

29.     Defendant the City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and State of New York, and having the powers and duties imposed by law thereon.

30.     The NYPD and KCDA are and were at all relevant times agencies of Defendant the City of New York.  At all times relevant to this action, Defendant the City of New York, by its agents, servants, and employees, was responsible for the operation, maintenance, and control of the NYPD and KCDA, and for the selection, training, supervision, and discipline of police officers and prosecutors.

31.     At all relevant times, the Kings County District Attorney (the "District Attorney" or "DA"), including Charles Hynes, was an elected officer of Kings County responsible for the KCDA, an agency funded by Defendant the City of New York. This lawsuit seeks to hold Defendant Hynes liable in his official capacity.

32.     At all relevant times, the KCDA and its authorized delegates had final authority, and constituted policymakers for the City of New York and for whom the City of New York is liable, with respect to the hiring, management, training, supervision, and discipline of personnel employed by or assigned to the KCDA.

33.     The State of New York has provided by statute that Defendant the City of New York's constituent counties—including Kings County—and hence Defendant the City of New York itself, are liable for torts committed by County officers and employees, such as the District Attorney and Kings County Assistant District Attorneys, and other employees of the KCDA.  *See* N.Y. County Law § 941.

34.     Defendant the City of New York was at all relevant times the public employer of Defendants Wolsky, Hutchison, Winning, Bennett, Cannizaro, and John and Jane Does 1-25, and legally responsible for torts they committed within the scope of their employment or under color of law. Defendant the City of New York is also obligated under law and by contract to indemnify and defend Individual Defendants named herein.

35.     Defendant Jay Wolsky is a former officer of the NYPD.  At all relevant times, he was a

duly appointed and acting officer of the NYPD employed by Defendant the City of New York and was a member of the 77th Precinct's detective squad. At all relevant times, Defendant Wolsky acted toward Mr. Marshall under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of York. This lawsuit seeks to hold Defendant Wolsky liable in his individual capacity.

36. Defendant Matthew Hutchison is a retired officer of the NYPD, who was a member of Brooklyn North Homicide and was partnered with defendant Wolsky during this investigation. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding the rank of Detective. At all relevant times, Defendant Hutchison acted toward Mr. Marshall under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Hutchison liable in his individual capacity.

37. Defendant Michael A. Bennett is an officer of the NYPD, who was a member of 77th Precinct Detective Squad and partnered with defendant Det. William Winning during this investigation. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding the rank of Detective. At all relevant times, Defendant Bennett acted toward Mr. Marshall under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Bennett liable in his individual capacity.

38. Defendant Det. William Winning is an officer of the NYPD, who was a member of 77th Precinct Detective Squad and partnered with defendant Det. Bennett during this investigation. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding the rank of Detective. At all relevant times, Defendant Winning acted toward Mr. Marshall under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New

York. This lawsuit seeks to hold Defendant Winning liable in his individual capacity.

39.     Defendant PO Peter C. Cannizaro is an officer of the NYPD, who was a member of TARU during this investigation. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding the rank of police officer. At all relevant times, Defendant Cannizaro acted toward Mr. Marshall under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Cannizaro liable in his individual capacity.

40.     Defendants John and Jane Does 1-25 are employees of the NYPD or KCDA who acted toward Mr. Marshall under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York; and who participated in the misconduct alleged herein; but whose actual names Mr. Marshall has been unable to ascertain notwithstanding reasonable efforts to do so. This lawsuit seeks to hold Defendants John and Jane Does 1-25 liable in their individual capacities.

## JURY DEMAND

41.     Mr. Marshall hereby demands trial by jury of all issues raised in this complaint.

## FACTS

### A.     The Crime and Arvel Marshall's Innocence

42.     On July 15, 2008, at approximately 9:50 p.m., two men walked down Dean Street toward Albany Avenue and made a left toward 139 Albany Avenue in Brooklyn, NY.

43.     Shots were fired, and Moustapha Oumaria was shot in the head directly in front of 139 Albany Avenue.

44.     Quickly thereafter, 911 calls were made requesting the police and EMS as witnesses stated that a man was shot and wounded.

45.     The witnesses described the shooter as a male, black with light skin, around 17 years

old with a white t-shirt and blue jeans. At the time of the shooting, Arvel Marshall was 36 years old and did not have a light complexion.

46.     Mr. Oumaria was pronounced dead on arrival at the hospital.

**B. The Initial Investigation and Eventual Identification**

47.     An unknown male flagged down PSA2 P.O.s Carvajal and Tam (the time and P.O.s first names not indicated), and reported that someone had been shot, pointing to 141 Albany Avenue. The officers approached and saw the deceased lying on the sidewalk, bleeding from the head and unresponsive. They radioed for patrol supervision and established a crime scene.

48.     At about 9:50 p.m., the first 911 call was made regarding a male shot in front of 139 Albany Avenue. Det. Wolsky and Sgt. Anthony Bramble responded to the scene. They observed that the deceased had a gunshot wound to the head. EMS transported the deceased to Kings County Hospital (KCH).

49.     At about 9:57 p.m., the police transmitted the shooter's description as a light-skinned Black male, 5'8", 17 years old, wearing a white t-shirt and blue denim jeans.

50.     At about 10:15 p.m., Det. Patrick Coward informed Det. Hutchison about the shooting, and that the deceased was likely to die. Hutchison responded to the scene with other BNH detectives.

51.     At about 11:07 p.m., at KCH, the deceased was pronounced dead. He had been shot once, in the forehead. There was no exit wound. The bullet came from the deceased's right. A deformed bullet was recovered from the left side of his head.

52.     On July 15, at approximately 10:35 p.m., at the 77th Precinct, Det. Robert Carboine interviewed 20-year-old Tete Eteh-Benissan. Benissan stated the following:

    **A.**     Before the shooting, he was sitting outside his apartment on the landing at the top of the steps. Zakari was standing on the landing, Zibo was sitting on the top step, and the deceased was sitting one or two steps below Zibo.

    **B.**     They were all talking when Benissan saw a dark-skinned Black male walking fast from

the direction of Dean Street. The male stopped in front of the location. Benissan heard a "pop," which sounded like a firecracker. He heard two or three more pops and saw sparks and the male pointing something at them. Benissan realized they were being shot at.

**C.**     Benissan tried to get into his apartment, but the door was locked. He knocked and his girlfriend Salimata let him in. Zakari and Zibo followed. Zibo said the deceased had been shot. Benissan went outside, saw the deceased bleeding from the head, and called 911 from his cell phone.

**D.**     The shooter was about 21 years old, 5'9" to 5'10," of medium build, wearing a white t-shirt, blue thick pants, and a dark-colored hat or du-rag. The shooter "fled" north on Albany toward Dean Street, the same way he came.

**E.**     Benissan knew the deceased for a year and did not know of any serious problems the deceased had where anyone would want to shoot him.

53.     On July 15, at about 10:35 p.m., at the 77th Precinct, Det. Coward interviewed 26-year-old Mamadou Abdul-Salam Zakari. Zakari stated the following:

**A.**     He was outside the location with his friends Zibo, Benissan, and the deceased, who was his roommate. Zakari was standing on the landing, at the top of the stairs. Benissan was sitting by his apartment door, Zibo was sitting at the top of the stairs, and the deceased was sitting in the "middle." Benissan then laid down on the landing.

**B.**     A Black male wearing a white t-shirt and dark jeans walked by and stopped between 139 and 137 Albany Avenue. The male fired three shots in their direction. Zakari looked and saw the shooter running back toward Dean Street. After the shots were fired, the deceased fell down the stairs. Zibo yelled that the deceased had been shot and told Zakari to call 911. Zakari saw the deceased lying on his side with blood next to his head, ran into his apartment, and called 911 from his cell phone.

  **C.**  Zakari was not sure of the identity of the shooter, because it was difficult to see his face. Zakari was unable to describe the shooter's height or weight. He did not know of any problems the deceased had. Zakari was too upset to view any photos.

54.  At approximately 11:35 p.m., at the 77th Precinct, Det. Coward interviewed 28-year-old Abdoulaye Zibo. Zibo stated the following:

  **A.**  He was sitting on the stoop outside of the location with Benissan, Zakari, and the deceased. The deceased was sitting two steps below him, not saying anything while Zibo, Benissan, and Zakari conversed.

  **B.**  Zibo heard what sounded like a firecracker. He looked over his shoulder and observed a young Black male wearing a white t-shirt and dark jeans shooting at them from the sidewalk.

  **C.**  Zibo ran into his apartment with Zakari and Benissan behind him. A few seconds later, he opened the door and saw the deceased at the bottom of the stairs bleeding from his head.

  **D.**  He did not know the deceased to have any problems with anyone. Zibo was too upset to look at photographs in photo management system.

55.  At about 11:45 p.m., at KCH, Det. Wolsky interviewed the deceased's cousin, Moutari Mahamare. Mahamare did not know who may have shot the deceased. The deceased did not have problems with anyone.

56.  On July 15, at 11:50 p.m., Det. Hutchison interviewed 911 caller, Abraham Omar,[2] by phone. Omar stated that he and the deceased were best friends. At about 10:00 p.m., Andrea, who

---

[2] This conversation between Hutchison and Omar was never confirmed. Neither the CRU nor the attorneys for Arvel Marshall have ever been able to find or speak with Abraham Omar. Upon information and belief, Abraham Omar that defendant Hutchison spoke to does not exist.

lived on Albany Avenue, called him saying that the deceased had been shot. He told Andrea to call the police, and then he called 911.

57.    On July 16, at about 11:30 a.m., Dets. William Winning and Michael Bennett responded to Wholesale Plus at 1529 Dean Street between Albany and Troy Avenues to obtain security camera footage "pertaining to the investigation." Winning spoke to Ben Cousin and reviewed the tape with him. Cousin made two copies of the footage for Winning. Winning gave the footage to Det. Wolsky for review and placed the other copy in the case folder.

58.    Later that day, (at 7:00 p.m.), at Fort Totten T.A.R.U., Det. Hutchison gave P.O. Peter Cannizzaro the surveillance camera compact disc ("CD") recovered from 1529 Dean Street. Cannizzaro viewed the CD and gave Hutchison still photo images ("stills") from the CD. The stills were placed in the case folder.

59.    On July 16, at about 5:00 p.m., Hutchison[3] called Omar, again. (*see* ¶53 above) Omar added the following:

> He and the deceased were from Niger. The deceased told him that he had a problem with a guy. The deceased was hanging out with Nicki (Callier). The deceased said that Callier's boyfriend was just released from jail, found out about him, and threatened to kill him. Omar knew of no other problems the deceased had with anyone.

60.    **Suggestive Photo array procedure with Bennisan:** On July 17, at approximately 2:20 p.m., defendant Wolsky showed Benissan a photo array with Arvel Marshall as the subject. Wolsky developed the array from the Photo Manager database. The computer randomly placed defendant in position number five and selected five other males, matching defendant's "general description." Benissan identified defendant as the shooter.

61.    On July 17, at approximately 3:50 p.m., at the KCDA, Benissan gave a sworn audiotaped statement to an ADA. Det. Hutchison and Sgt. Moran were present. Benissan stated the following in sum:

> The shooter was a Black male, 5'9" or 5'8", with a skinny build, wearing a white shirt, thick or dark pants, and a du-rag or a hat. He walked by and, without saying anything, fired three or four shots at them. After the shots started, Benissan tried to get into his apartment, number 2, but it was

---
[3] Interestingly, Hutchison was the only person ever to have spoken with Omar.

14

locked. His girlfriend opened the door. Zibo was lying down on the floor "after the second shot, trying to avoid a bullet." Benissan never saw the shooter before. The shooter was alone. Benissan did not see anyone else. After the shooting, the shooter went back toward Dean Street

62.     On July 17, at approximately 4:45 p.m., at KCDA, Zibo gave a sworn audiotaped statement to an ADA. Defendant Hutchison and Sgt. Moran were present. Zibo stated the following in sum:

> He and the deceased were on the stairs. The deceased was on his right, about three steps down. He was at the top of the stairs. Benissan was sitting by the door and Zakari was standing on the balcony. They heard a loud sound, and he turned around and saw a "kid" shooting at them. He ducked. When he heard the third shot, he was lying down on the balcony. The shooter was "a little darker or brown skin." He was wearing a white t-shirt and dark jeans. The shooter did not say anything. He had never seen the shooter before. After the shooting, the shooter went toward Atlantic Avenue (one block past Dean).

63.     On July 21, at approximately 4:40 p.m., at the 77th Precinct, Dets. Wolsky and Hutchison re-interviewed Zakari. His statement was consistent with his prior statement except as follows in sum:

> He, Benissan, Zibo, and the deceased were all on the landing at the top of the stairs. The deceased was sitting near the top of the stairs. (he had previously said the deceased was in the middle) He saw the shooter walking southbound on Albany Avenue (coming from the direction of Dean Street), and the shooter fired with his right hand. He heard that the deceased got into an argument several weeks ago (he did not mention with whom). He was not there and did not know what the confrontation was about (he previously said he did not know the deceased to have any problems).

64.     On July 21, at about 5:14 p.m., at the KCDA, Zakari gave a sworn audiotaped statement to an ADA. Det. Hutchison was present. His statement was consistent with his prior statement except as follows in sum:

> Zakari was on the "stoop" with the deceased, Benissan, and Zibo. A guy came up when the deceased was at the bottom of the "stoop" (he had said the deceased was in the middle, and near the top). The guy fired three shots and Zakari realized the deceased had been shot. His roommate "Zac" (Zacoiu Daodaz, *see* below CRU Investigation) told him that about three weeks ago when Zakari was on vacation, the deceased was involved in a fight in front of their building. A group of young people "from that project" were chasing each other. The fight was over a girl, whom the deceased was trying to help, and with whom the deceased was involved. Zac pulled the deceased inside the apartment and then heard some shots or firecrackers.

65.     On July 22, 2008, Arvel Marshall was arrested.

66.     **Janiqua Callier's Statement to Police:** On July 22, at about 9:15 a.m., at the 77th

Precinct, Dets. Hutchison and Wolsky interviewed Callier. She stated the following in sum:

She knew Arvel for about six years. Arvel's brother, Harold, is married to her mother, Delores Thornton. Callier became romantically involved with Arvel a little more than a year prior to the shooting. She became friends with the deceased at the end of the summer of 2007 when he visited her neighbors. She became romantically involved with the deceased when Mr. Marshall was in jail.

She started seeing Mr. Marshall again when he was released from jail around November 21 or 24, 2007. Arvel knew she had been seeing the deceased and said he did not want any man touching her. In December 2007, she spent the night with the deceased. The next day when she came home, Arvel said that he and her brother, Jeffrey Thornton looked for her at the deceased's house. Jeffrey showed Arvel where the deceased lived.

"Sometime later," Callier and Mr. Marshall visited the deceased at his security job on Ralph Avenue and Park Place. There were no problems that night. She occasionally brought the deceased food to his job.

"Sometime in March" the deceased came to her house and argued with Arvel about Callier. The deceased told Arvel she was still "[the deceased's] girl" and they started yelling. The police arrived. The deceased was arrested because he refused to leave. After the police left, Mr. Marshall pulled her hair out and kicked her. He used to beat her "all the time."

Around April 20, 2008, Callier had Mr. Marshall "locked up" for beating her. On May 29, 2008, he was released from jail and went to her house. He said, "You better not let me catch you doing anything"—meaning "sleeping around."

About two weeks prior her statement, Callier was at Mr. Marshall's mother's house, and he was telling everyone there she was a "ho" and was sleeping around with the deceased and "Supreme."

On July 7, Callier received a $900 income tax refund. The next day, she gave Arvel $200 to buy clothes. Arvel was drinking beer and said, "fuck that, I'm gonna get a gun" to go after "L" up the block. She told him to buy clothes or return the money. Arvel did neither.

On July 15, at about 11:00 a.m., Arvel left the house to buy Callier food. He went to his mother's house. At 4:00 p.m., Arvel's mother called Callier saying that Arvel was showing his friends naked pictures of her. Callier called for a cab, went to her friend Trisha's house in East New York, and spent the night. Mr. Marshall called her about three times, but she hung up on him.

At 4:00 a.m. (July 16) Callier went to sleep and woke at 9:00 a.m. She had 12 missed calls and six voicemails from Mr. Marshall. At about 9:00 p.m., she spoke to Arvel and told him she was coming home and needed her keys, which he had. She waited at her house for Arvel. He arrived an hour later and complained about her "cheating" on him.

On July 22, 2008, the day of Mr. Marshall's arrest, Arvel woke her saying he believed the police were at the door. As she was getting dressed, Arvel was gone. She looked out the window and saw him jump over a little fence and run down the street as the police chased him.

67.    **Janiqua Callier's statement to the KCDA:** Later on July 22, 2008 (at about 4:40

p.m.), at the KCDA, Callier made a sworn audiotaped statement to an ADA. Det. McTighe was

present. Callier stated the following:

> She was dating the deceased when Arvel was in jail. Arvel was released from jail at the end of
> November. Arvel found out about her relationship with the deceased from her brother, Jeffrey.

> Mr. Marshall knew where the deceased lived because Jeffrey and Mr. Marshall went over to the
> deceased's house looking for her. Callier and her sisters spent the night at the deceased place. She
> had told Jeffrey where the deceased lived, so Jeffrey would know where they were. Callier last saw
> the deceased two months ago.

> The ADA asked whether Arvel and the deceased fought. Callier said they "didn't f[i]ght they just
> had an argument." In March, the deceased came by her house to say hello. Arvel let him in and
> said it was okay to hang out with them. The deceased said he would leave because he did not want
> any problems. Mr. Marshall knew Callier was seeing deceased at the time. Both Arvel and the
> deceased were drinking. Arvel thought that when he went to the bathroom, the deceased and
> Callier were talking about getting back together. The deceased and Mr. Marshall began to argue
> about Callier. The deceased "got loud." They were both drunk and "it was crazy." The police came
> and arrested the deceased because he was "rowdy" with the police and saying, "No, no, no. That's
> my girl."

> In July, when Callier gave Arvel $200 to buy clothes, he started drinking and said he was going to
> get a gun "and show these [ni**ers]." She did not know if Arvel bought a gun. She never saw a
> gun and never saw one in her house.

> The ADA asked what happened on the day of the shooting on July 15. Callier said, "I don't know
> about any shooting I didn't hear anything."

> The ADA asked about Mr. Marshall's six messages, and 12 phone calls. (*see* ¶66 above, Callier
> statement to the detective) Callier said Arvel called from his mother's phone denying that he
> showed naked pictures of her. She was fed up with Mr. Marshall and was going to leave him, but
> he had the keys and she needed to get into her house.

> The ADA started to ask, "The night after," when Det. McTighe said something (inaudible). The
> ADA then asked, "On the day of the shooting," did Callier meet Mr. Marshall after he left her all
> those messages. Callier replied that she went home and told Arvel to meet her at 9:00 p.m., with
> her keys. She took a cab home and Arvel showed up an hour later. He said he was chilling with his
> homeboys in the park and told Callier, "Don't rush me."

> The ADA asked if Mr. Marshall told her anything about the shooting. Callier said she never even
> heard about the shooting until today. The ADA asked, "He never said anything about the
> shooting?" Callier said Mr. Marshall did not say anything about it.

68.    **Defendants Wolsky and Hutchison conduct suggestive lineups**: On July 22, at the

77th Precinct, Det. Wolsky conducted a lineup with Arvel as the subject. Det. Hutchison was present.

Arvel chose position number one. The fillers' ages, height, and weight were as follows: 29, 5'9", 160

lbs.; 28, 5'9", 165 lbs.; 36, 5'10", 155 lbs.; 37, 5'10", 185 lbs.; and 25, 6'3", 185 lbs. Benissan, Zibo, and

Zakari viewed the lineup, at 4:40 p.m., 4:50 p.m., and 4:57 p.m., respectively. They all identified

number one, Mr. Marshall, as the shooter. They all viewed the lineup with the participants both seated

and standing.

69.     At about 5:00 p.m. on July 22, 2008, Mr. Marshall was arrested and charged with

second-degree murder.

70.     **Marshall's Statement**: At about 6:00 p.m., at the 77th Precinct, Mr. Marshall was

present with Defendants Hutchison and Wolsky. Mr. Marshall was read his *Miranda* rights, and

answered "yes" to each question, but refused to sign or initial the *Miranda* sheet. At about 6:05 p.m.,

Mr. Marshall made a *Mirandized* statement. Wolsky questioned Mr. Marshall about whether he was

involved in a relationship, and whether he knew who Callier dated. Mr. Marshall said he had been

dating Callier for about 14 months and provided her address. Callier dated Anthony about two years

ago, and "Supreme" when Mr. Marshall was in jail. Wolsky asked if Arvel knew the deceased. Mr.

Marshall said he saw the deceased with Callier and he thinks they "are" friends. Callier told him the

deceased was "good looking" and Mr. Marshall told her he "didn't want to hear any of that shit."

When asked if the deceased and Callier were more than friends, Mr. Marshall said, "She can fuck who

she wants. I can too, we are grown." When asked if he knew why he was at the precinct, Arvel said,

"No, I want to know what's up." Arvel was told it was a homicide investigation. Arvel said, "Fuck this

I got nothing to say without an attorney." The questioning stopped.

71.     On July 28, 2008, Arvel indicted with one count of Murder in the Second Degree (P.L.

§ 125.25[1]), and two counts of Criminal Possession of a Weapon in the Second Degree (P.L. §

265.03[1][b], [3]).

**C. Wade Hearing**

72.     Defendant Wolsky testimony about the identification procedures was consistent with

the police documents. He added the following:

**A.** When he arrived at the scene, the witnesses told him that they were hanging out with the deceased at the top of the staircase when a male approached the front of the building and fired a number of times. The deceased fell from the top of the stairs to the bottom. (H.8)

**B.** From the phone interview of Abraham Omar (*see* above), it was learned that Mr. Marshall had a troubled relationship with a female and previously approached the deceased. Detectives obtained Mr. Marshall's photograph and created a photo array. (H.9-10)

**C.** Regarding the lineup, Wolsky did not know who asked the witnesses to come to the precinct, what was said to them, or if they arrived together. (H.28) The witnesses were separated at the precinct. (H.16)

**D.** Normally, a lineup up is viewed with the participants in a seated position. If a witness requests that they stand, the participants individually approach the viewing window. Here, the three witnesses viewed the lineup with participants both seated and standing. Wolsky did not recall whether the participants approached the window. (H.30) Wolsky identified Mr. Marshall in court as the person "seated next to defense counsel." (H.24)

73. Defense counsel argued that the photo array was suggestive because defendant's hairstyle was noticeably different from the others. The suggestiveness of the photo array tainted the lineup. Counsel agreed with the court that he was not challenging the lineup as suggestive. (H.34) The People argued that the photo array "speaks for itself" and, in any event, any suggestiveness was attenuated by the five-day passage of time between the array and the lineup. (H.35) Counsel replied that "once an image is in your mind" a passage of five or even 10 days cannot ameliorate the taint from a suggestive photo array. (H.36) Counsel added that Mr. Marshall wanted him to mention that defendant was the only person in the lineup with braided hair. (H.37)

74.    By written decision dated September 21, 2009, the court held that the identification procedures were not unduly suggestive. Regarding the photo array, the court stated, among other things, that the men had similar hairstyles. (Dec. at 3) Regarding the lineup, the court stated, among other things, that all participants wore baseball caps to conceal the differences in hairstyles, and any height or weight differences were eliminated by having each participant seated. (Dec. at 4)

**D. Defense Investigation Produces Evidence that the Identification Procedures Were Tainted**

75.    Nicky Johnson (aka Janiqua Callier) was interviewed by a defense investigator on September 28, 2009. She stated in sum:

**A.**    She confirmed Arvel's alibi – that he was at his mother's house at the time of the murder.

**B.**    The last time she dated the victim was in the beginning of 2008, roughly 7 months prior to the shooting, severely refuting the motive that Marshall killed Oumaria over Ms. Callier.

**C.**    Oumaria had beef with a lot of people in the neighborhood.

76.    On October 3, 2008, a defense investigator interviewed Mr. Zakari. Mr. Zakari was not sure of his identification of Mr. Marshall in the lineup because, as he conceded, he almost got a good look at the shooter's face. Zakari also admitted that police told him that "Nikki's" boyfriend was arrested and was the shooter.

77.    On October 8, 2008, Mr. Zakari again spoke to a defense investigator. Zakari admitted that the lineup was suggestive in that none of the fillers looked anything like Arvel. The defense investigator conducted a photo array with Mr. Zakari. One of the photos was of Arvel. Zakari could not make an identification.

78.    On October 10, 2008, Mr. Zakari again spoke to a defense investigator and admitted that he was not sure about his identification of Mr. Marshall.

79.     On October 10, 2008, Mr. Benissan spoke to a defense investigator. Mr. Benissan stated that none of the fillers in the lineup looked like Mr. Marshall. He also was shown a photo array with Mr. Marshall in the array. Mr. Benissan stated that he was not sure if Mr. Marshall was the shooter on July 15, 2008.

**E. Trial**

The Trial Was Rife With References of a Surveillance Video that Was Never Disclosed to the Defense

80.     On December 7, the first day of jury selection, defense counsel told the court that defendant wanted him to ask the prosecutor whether any surveillance tapes existed. Counsel said, "[defendant] understands that there are video cameras in the area and he's asking if there are surveillance tapes, that they be turned over." (VD.86-87) The court told the prosecutor to turn over any tapes he had. The prosecutor said, "Don't have any. We have still photos which I supplied to [defense counsel] months ago." Counsel said, "And they're of no value." The court stated, "There you go." (VD.87 [emphasis added]). Defendant said, "That was too quick. . . . It is tapes. He's lying." (VD.87) The case recessed for lunch and jury selection continued when the parties returned. (VD.87-88)

81.     The next day, before jury selection continued, counsel stated that when he had asked the prosecutor for any surveillance videos, the prosecutor indicated there were not any. Counsel noted, "My client did show me a DD-5 that he wants to share with the Court, DD-5 number 37." (VD.150 [emphasis added]) Counsel summarized the DD5, which indicated that security camera footage was recovered from 1529 Dean Street and that the detective reviewed the footage, made two copies, and placed it in the case folder. (VD.150-51)

82.     The court said, "Mr. [Prosecutor]?" The prosecutor said, "That is correct" and referred counsel and defendant to a "follow-up" DD5 indicating that "stills were taken from those videos." The prosecutor said he had copies of the videos, but "cannot open" them. The prosecutor stated that when defense counsel came to his office "they were unreadable." The prosecutor reiterated that he could not

"open them," adding that it was "one of the reasons why I assume stills were taken off of that." (VD.151) The prosecutor stated that he provided the stills to counsel. Counsel recalled seeing the stills, and the prosecutor trying to open the video. Counsel did not recall receiving or retaining a copy of the stills. Counsel stated he recalled "videos with no evidentiary value in them," and wanted to know about the existence of the video. (VD.151-52)

83.    The court told the prosecutor to get a copy of the video for counsel to try to open it. The prosecutor said that he did not believe that "anything was transferred to [the video]." Defendant asked why stills would be made if there was nothing on the video, adding, "That's the thing that's messing me up. I'm confused." Why make a copy of the tape "if there is nothing on it?" (VD.152) Defendant believed there was something on the video that would prove his innocence, and he did not want anything erased. (VD.153, 154) The prosecutor stated, "Just to be clear," the surveillance camera did not show the shooting location—it was around the corner. The court remarked, "The police were looking to see if they could possibly see a suspect fleeing." (VD.155) Jury selection continued and concluded.

84.    Before the preliminary jury charge to the jury, counsel stated that defendant was concerned about the video surveillance, and that defendant raised an interesting issue—how did the prosecutor obtain the stills if the tapes could not be opened or played? (T.2)

85.    The prosecutor replied that one security tape was recovered from 1529 Dean Street. The NYPD made two copies. The NYPD TARU Units "was able to go in and get the stills." TARU gave the copies and stills to the police who gave them to the prosecutor. The prosecutor had the two copies in his office, which he was unable to view. The prosecutor did not know how TARU viewed the tape, but the stills were made from "whatever programs" TARU had. (T.3-4) The prosecutor said he would bring in the two discs and give a copy to defense counsel "for whatever computer he can get it to play on." In the "interest of justice and fairness," counsel asked the court to have a TARU technician come to court. (T.4)

86.     The court asked whether the stills were "all of the representations" from the surveillance video. The prosecutor replied, "Yes. That is my understanding." The court asked, "There is nothing else on that disk that hasn't been made into a hard copy?" The prosecutor said, "Yes. That is my understanding, correct." The court said, "Fine." (T.4) The prosecutor noted that the stills depict "two individuals walking down the street." The court stated that was irrelevant because the defense was entitled to any photographs including videotapes with certain exceptions that did not apply here. (T.5)

87.     The court stated that the People's position was not "proper." It would "fundamentally emasculate the law if the People could say, the Police Department converted this to a disk. The Police Department can open it. I can't open it. I will give it to the defense. If they can open it, they can open it." (T.5) The court directed the People to have TARU, any NYPD agency, or the KCDA, come to court with equipment to view the video. If it cannot be viewed on a PC then the court would direct the police to allow counsel to view them at a PD location so he can compare the photographs with the video. Counsel said that he viewed the stills but did not recall if he had them. The court said that they were probably in counsel's office, and counsel probably did not have them in court if they were of no value. (T.6)

88.     Later, (after the People's first witness, Zakari [*see* below]), the prosecutor said he spoke to a TARU detective, who explained that a specific program was required to view the surveillance video and that if KCDA did not have the program, TARU could supply a laptop with that program installed. (T.86) The prosecutor believed KCDA had the program and he would bring a laptop with the program installed tomorrow. (T.87) The following morning, on the People's case, nothing was mentioned about the video. (T.91)

89.     Later, (before the People rested their case), the prosecutor stated that he could not bring the KCDA laptop which he knew played the video. It was "from Tech Services" and "they will not let it out of Tech Services['] sight." A colleague brought another laptop from Tech Services to

23

court, but it did not work. The prosecutor's colleague was going to get another laptop. In the meantime, the prosecutor's colleague was in court with the surveillance tapes. (T.306)

90.     After a lunch recess, defense counsel stated, that the prosecutor "indicates that he has a surveillance video," and "My client would like to know if there are any certifications which would verify the location from which this tape was taken." (T.327) The prosecutor said "No." Counsel asked how the People came in possession of it. The prosecutor said, "Everything is reflected in the DD5s." (T.327)

91.     During his testimony, Mr. Marshall repeatedly said there were "tapes" and further stated that they showed the shooter. The court told Mr. Marshall to "be quiet" and the tapes were not relevant. (T.384-85, 389-91) After Mr. Marshall testified, he asked that the stills be admitted into evidence. Arvel stated that they showed "two guys" neither of whom looked like him and it appeared that one had a weapon. The court told Arvel, "Be quiet." (T.422-23).

92.     Arvel was certain that he was not depicted in the stills. Post-conviction, Arvel attempted to obtain the video from his trial counsel, his appellate attorney, and the KCDA, to prove his innocence. (*see* below) CRU provided Arvel with the video.

The Government's Case

93.     The People stated that Mr. Marshall's motive for the murder was jealousy—the deceased was involved with Callier, Arvel's "on again off again" girlfriend. (T.22) The deceased's friends knew Callier, and they knew that the deceased had problems with Arvel, whom they never met. (T.23) The People told the jury that three eyewitnesses described the shooter as short and kind of skinny and that he "looked young because of his body type. They thought he was young." (T.26) The People asked the jury to find Mr. Marshall guilty based on the testimony of the three eyewitnesses. (T.31)

94.     Zakari's testimony was consistent with his prior statements. He added the following:

**A.** In July 2008, he lived with the deceased for a year and two months. (T.40-41) At some point, he met the deceased's girlfriend, Callier. (T.41) He first met Callier at his apartment, and he saw her every night that she was with the deceased. (T.42)

**B.** Zakari testified that the deceased and Callier stopped seeing each other more than three months before July 15. (T.43) He also testified that at the time of the shooting they saw each other from "time to time." (T.79) He was not aware that Callier had a relationship with anyone other than the deceased. (T.79)

**C.** Just before the shooting, "a lot" of people were walking by their house. Zakari testified that: "the guy was coming, he just stopped at the sidewalk and he start[ed] shooting." (T.50); when he heard the first shot, he had been facing his door and had his back to the street (T.52); and the shooter came from "the left" (Dean Street). (T.57)

**D.** When he heard the first gunshot, he turned around and saw a man shooting. (T.52, 68) He saw the shooter's profile, on the left side. (T.53-54) The shooter was dark-skinned, wearing a long-sleeved white T-shirt, a blue Yankees hat, and dark pants. (T.54)

**E.** Two more shots were fired. (T.54) Zakari did not pay attention to the direction of the shooting. (T.55) After the third shot, Zakari went into his apartment. (T.56) The shooter walked fast to the next building and then started running in the same direction from where he came. (T.57, 62)

**F.** **Zakari twice testified that he would be able to recognize the shooter. Both times, after looking around the courtroom, he said the shooter was not there.** (T.62-63)

**G.** He went to the precinct to view the lineup with Benissan and Zibo. (T.80-81) When they arrived, they were told that someone had been arrested for the shooting that morning. (T.81-83)

**H.** He told the police he was not sure of the shooter's identity and could not describe the shooter's height or weight. (T.73) He told the police he did not see the shooter's face. (T.83)

**I.** He recalled speaking to an investigator and describing the shooter as dark-skinned, young, and the same age as Zakari and his friends. (T.76-77) He did not recall telling the investigator that the police provided him with information about the shooter, including the shooter's relationship. (T.79)

95. Det. Hutchison testified as follows:

**A.** On July 16, he received information about a woman from 911 caller Abraham Omar. Computer checks on a nickname and an address provided led to Callier, which led to Arvel. (T.118-19, 159-60)

**B.** After Mr. Marshall was apprehended, Hutchison called Benissan and said he had someone in custody regarding the incident. Hutchison asked Benissan to come to the precinct with Zibo and Zakari to view a lineup. (T.130-31, 143; People's Ex. 4A-D [lineup photos]) Hutchison later denied that he told Benissan he arrested the shooter. (T.170)

**C.** The defense elicited that Hutchison showed Benissan a photo array prior to the lineup. (T.164-66; Def. Ex. A [photo array]) Hutchison acknowledged that Arvel was the only person in the array whose hair was parted down the middle. (T.167-68)

96. Benissan's testimony was consistent with his prior statements. He added the following:

**A.** He saw the shooter coming from Dean Street, walking a "little" fast. Benissan watched as the shooter approached. The shooter was small, skinny, and wearing dark pants, a white t-shirt, and a hoodie, hat, or du-rag. He could not see the shooter's head, forehead, or hairstyle. (T.199) Benissan denied that he told the police that the

shooter was about 21 years old, but then testified that he told the police, "probably he would not be older than 21." (T.219)

**B.**     The shooter faced the "whole house" and raised his arm to his face. (T.201) He aimed the gun at the stairs. The deceased was sitting on the stairs. Three shots were fired. After the second shot, Benissan tried to get into his apartment. By the third shot, Benissan ran inside. (T.202)

**C.**     Benissan focused his attention on the shooter's face and gun. Nothing blocked his view. (T.202) The streetlights were "really lit up." (T.203)

**D.**     Benissan admitted he did not look at the shooter after the second shot and the first two shots were fired in a matter of seconds. (T.216-17) He admitted that during those few seconds, he did not look at the shooter. Benissan then said he "[a]ctually" looked at the "guy" as he walked up the block, "way before anything started." (T.217)

**E.**     Benissan acknowledged it was a summer night with activity; other people were walking on the sidewalk, and cars were going by. He noticed this "guy" because he walked fast, and **"looked like a kid"** playing a game trying to get away from the friend. (T.218) Maybe "hide and seek." (T.219)

**F.**     When Benissan viewed the photo array, he was told to focus on the face. The detective did not say anything about whether the suspect was in the array. (T.209) When shown the photo array during his testimony, Benissan acknowledged that Mr. Marshall was the only one whose hair was parted down the middle of his head. (T.222) He drove to the precinct with Zakari and Zibo to view the lineup. (T.210)

**G.**     Benissan recalled speaking with an investigator (for the defense) on August 8, 2008. (T.224) First, he did not recall the investigator asking about the lineup. Then he testified he was never asked about it. (T.224-25, 228) Benissan denied that he told the investigator that the lineup participants did not resemble Mr. Marshall. He denied that

27

he told the investigator that he was not certain whether number five (defendant) in the photo array was the shooter. (T.231-32)

97.     Zibo's testimony was consistent with his prior statements. He added the following:

**A.**    The deceased stayed with him on and off. At the time of the crime, he had known the deceased for three years. The deceased dated Callier, and for two months he brought her home four to five times a week. (T.236) **<u>Zibo last saw the deceased with Callier four to five months before the shooting.</u>** (T.237)

**B.**    At the time of the shooting, Zibo heard what sounded like a firecracker. He looked and saw fire from the weapon and ducked. He turned around, got up, and ran into Benissan's apartment. He saw the shooter walking away. (T.241) The shooter went toward Dean Street. (T.244-45)72 The lighting was "great," and you could "see everything." (T.243) He heard the first shot, saw the second shot, and heard the third shot as he ducked. (T.243) Two or three seconds elapsed from when he saw the first muzzle flash to when he ran into the apartment. (T.255-56) He saw the shooter's face when the shooter fired the gun, and when the shooter turned to leave, Zibo saw the profile. (T.242, 244) Each time was in "an instant." (T.256) Zibo had never seen the shooter before. (T.255)

**C.**    The shooter had a round nose, a round face, "like big brown skin," and was wearing a "fitted" hat. (T.242-43) On cross examination, **<u>Zibo acknowledged that he told an ADA that the shooter was a "kid."</u>** (T.255) On recross examination, he testified that he described the shooter as "a kid" because they "were on top of the balcony, there is a little distance," and the shooter was "short and skinny" and wearing a t-shirt and jeans. (T.258)

**D.**    Zibo went alone to the precinct to view the lineup. (T.249) When he viewed the lineup, he asked to have number one (defendant) brought closer, and they brought number one right in front of him. (T.250)

**E.**      On cross examination, Zibo denied telling the police that he did not know of any problems the deceased had. He testified that he told the police that the deceased got into "a couple of fights." (T.254) On redirect examination, the prosecutor asked Zibo if he knew of any problems the deceased had with Callier's boyfriend. Zibo then testified that he heard they had a fight and Callier's boyfriend went to the deceased's job. (T.258-59)

**F.**      The deceased always used Zibo's cell phone. The People elicited that Zibo received a voicemail on his phone for the deceased about "getting" the deceased for being with Callier. The court sustained defense counsel's objection. (T.259-60)

The Defense Case

98.      Tonya testified as follows:

**A.**      She was Arvel's sister. She lived on Mother Gaston Blvd. and Pitkin Avenue. On the evening of July 15, she was home with her children and mother (who also lived there). Arvel was there. (T.337-38)

**B.**      At 9:45 p.m., her mother walked Arvel downstairs to catch the number 14 bus. The bus stop was in front of Tonya's building. Tonya looked out her window and saw Arvel get on the bus. She knew the time because she looked at the clock as she waited for her mother to return. (T.338-39)

**C.**      On cross examination, Tonya reiterated that Arvel left at 9:45 p.m. (T.342) Three weeks after Arvel's arrest on July 22, Tonya learned that Arvel was charged with murder. She did not know when the crime occurred and did not ask anyone. (T.344-45) Arvel told her he was being framed. (T.353)

**D.**      Callier called Tonya and told her the police apprehended Arvel. (T.354) Thereafter, Callier told Tonya that the police interrogated her about something Arvel did not do and that she could not discuss the interrogation. (T.357-58)

**E.** In September 2008, Tonya was interviewed by two (defense) investigators. She told them that Arvel could not have been the shooter because he was getting on a bus at 9:45 p.m. (T.348-49, 353, 360) She did not tell this to anyone else because no one came to speak to her (T.352, 360, 368-69) The investigators interviewed Tonya at her home. They had asked Callier to meet them there. Callier went there and waited with Tonya and her mother for the investigators. The investigators had instructed them not to talk about the case. (T.354, 357-58)

**F.** Tonya denied that she told the investigators that Arvel and Callier were having an affair. She told them that Arvel was seeing Callier, but Callier was not his girlfriend. Arvel was at Callier's home every day. (T.355-57) Tonya did not know Arvel showed pictures of Callier to anyone. (T.359-60)

99.    Arvel testified that he did not commit the murder and was at his mother's house at the time of the crime.

100.   P.O. Kelly's testimony was stipulated as follows: On July 15, at about 11:35 p.m., he interviewed Zibo at the scene. Zibo stated that as far as he knew the deceased had no problems with anyone. (T.431) (Zibo denied he made that statement, *see* above, Zibo's testimony)

101.   Graham testified as follows:

**A.** He was an investigator for Walker Investigations, which investigated defendant's case for defense counsel. (T.433-34) On October 8, 2008, Graham and Mr. Walker interviewed Benissan at his house. Benissan stated that the lineup participants did not resemble each other and were different heights. Counsel asked whether Benissan compared defendant to the other people in the lineup Benissan replied, that Benissan "couldn't make a positive I.D. He said the defendant looked familiar, but [Benissan] could not be sure." (T.435)

**B.** On cross examination, Graham testified that his notes of his interview were at home, but he had provided defense counsel with copies. (T.440-41) Graham admitted that his printed report, which he had with him in court, did not mention Benissan's uncertainty about his identification of defendant in the lineup. (T.443)

Summations

102. Defense counsel argued that photographs of the photo array and the lineup were not clear, but upon examination, they showed the identification procedures were not fair. Defendant's hairstyle stands out in the photo array. And all the lineup participants wore baseball caps backward exposing their hairstyles. Although all participants were seated, their height differential was noticeable. (T.464-69) Counsel attacked the witnesses' identifications, noting that Zakari was unable to identify defendant in court. (T.470-75) Regarding the defense case, counsel mentioned that Tonya saw defendant leave at 9:45 p.m. Counsel argued that if defendant had committed the crime, he would not have testified and had his prior criminal record exposed. Defendant ran from the police because he was not supposed to be with Callier pursuant to an order of protection. Defendant knew the deceased and he had no motive to commit the crime. (T.476-78)

103. The prosecutor argued that defendant acted out of anger and jealousy. The deceased had an ongoing relationship with defendant's girlfriend, Callier. (T.479) Defendant had an argument with the deceased that was "so loud and so violent" that the police had to be called. (T.483) On July 15, after defendant showed naked pictures of Callier, they argued and Callier mentioned the deceased's name, which had "a very profound effect" on defendant. (T.485) The prosecutor argued, among other things, that the witnesses had good views of defendant's face. The area was well-lit, and they viewed defendant from 10 to 14 feet away. (T.485-89) Benissan thought the shooter was "a kid" playing games and running. But then Benissan focused on the shooter when the gun came out. (T.488) The People suggested that Zakari was too scared or nervous to identify defendant in court. (T.495-96)

Verdict and Sentence

104.     Defendant was found guilty of Murder in the Second Degree (P.L. § 125.25[1]). (T.547) As the court thanked the jurors for their service, defendant yelled that he did not kill the deceased and had "pictures to prove it." (T.549)

105.     On January 5, 2010, before sentencing was imposed, defendant objected to the following: the whole trial procedure; not receiving a full discovery package; the court's bias against him; and the court's denial of his motion for a new attorney because trial counsel did not effectively represent him. (S.5) The court converted defendant's arguments into a motion to set aside the verdict. Counsel then realized he never made a motion and incorporated defendant's arguments adding that there was no proof beyond a reasonable doubt of defendant's guilt (S.6) The court denied the motions (S.7) The court sentenced defendant to a prison term of 25 years to life. (S.9)

**F. CRU Joint Investigation**

**Surveillance Video**

106.     The eyewitnesses stated that the shooter was wearing a white t-shirt, dark pants, and some type of hat, and came from and fled back in the direction of Dean Street. As set forth above, the day after the shooting, the police recovered surveillance videos from a commercial store at 1529 Dean Street, which was just around the corner from Albany Avenue. The store is on the north side of Dean Street, between Albany and Troy Avenues. The Weeksville Gardens ("Weeksville") Development is also on the north side of Dean Street on the other side of Troy Avenue.

107.     Defendant sent CRU copies of numerous letters he sent his trial attorney, appellate attorney, and the KCDA FOIL Unit attempting to obtain a copy of the videos. CRU located additional letters in the FOIL file. In pertinent part, defendant's attempts were as follows:

A.     On August 26, 2010, defendant wrote to trial counsel asking for "a copy of the entire surveillance camera compact disc ("CD"). Because you only provided me with four photographs from that disc." Defendant stated that he could have a family member pick it up. Trial counsel wrote back, "I have no CDs in my file."

**B.**    On April 20, 2011, defendant wrote to trial counsel asking whether counsel "ever

received a copy of the surveillance camera compact dis[c] from the District Attorney."

Defendant stated:

> I am truly innocent . . . . I would appreciate if you would tell me if you received a copy of
> the DVD. You only provided me with still photos that were made from the DVD, on
> December 8, 2009, when the prosecutor's co-worker walked in the courtroom with the disc
> and still photos in her hand.
> Can you please get back to me on this as soon as possible, because I need a copy of that
> DVD to prove I did not commit this crime.

**C.**    Counsel wrote back that he had "no such DVD in my possession" and suggested that

defendant have his appellate attorney contact the DA's office "to see if such tape

exists and is available."

**D.**    On July 21, 2011, defendant wrote appellate counsel asking if he had the surveillance

video. Appellate counsel wrote back that he was only provided with the Supreme

Court file, which did not include the video. Appellate counsel suggested that

defendant write to trial counsel.

**E.**    By letter dated March 25, 2014, defendant wrote to the KCDA asking for the

surveillance video, and other items. The Freedom of Information Law ("FOIL") Unit

handled defendant's request. In pertinent part, FOIL offered defendant the video for

purchase. Defendant said that his nephew would purchase the video and pick it up

from FOIL because the correction facility (Elmira) did not allow inmates to possess

CDs.

**F.**    Thereafter, defendant twice wrote FOIL renewing his request for the video and asking

for other records. FOIL wrote back that it consolidated all requests. Ultimately, FOIL

denied defendant's requests, explaining that the records were exempt, at that time, due

to the pending litigation of the stayed *habeas* petition.

**CRU Viewed Surveillance Video**

108. CRU located a DVD of the videos in the trial file. CRU uploaded the footage and viewed it without issue. There are two videos—marked as Camera 8 and Camera 9. Although the footage is grainy, the two videos clearly depict two Black males walking down Dean Street toward Albany Avenue, passing a drink in a white cup back and forth. They both appear young. One of the young men is wearing a white t-shirt, blue jeans, or dark pants, and has something dark on his head—matching exactly the description of the shooter provided by all three eyewitnesses. The other is dressed in all black.

109. The CRU summarized the video, in sum and substance, as the following:

**A.** The young man in the white t-shirt lifts his shirt on the right side and does something with his right hand near his waist, in the vicinity of his right hip. Then he lifts the hem of the shirt up and out, lowering the shirt and covering the area that had been exposed. (Camera 8, 24:00-24:55)

**B.** A view of the back of the young man in the white t-shirt shows him doing something with his right hand near his waistband, ultimately removing a dark object. He holds the object in his right hand with his arm straight down by his side. (Camera 9, 45:36-45:37)

**C.** After the two young men go off-screen while walking toward Albany Avenue, two men— clearly older—appear on the street. One of them is also walking toward Albany Avenue on the same side of the street as two young men seen earlier. The other is walking two dogs on the opposite side of Dean Street. At one point, something draws the attention of both men and they both look toward Albany Avenue and stop walking. Then they both turn and start walking quickly away from Albany Avenue. The man with the dogs crosses the street over to the other older man, while each man glances back over their shoulder toward Albany Avenue. (Camera 9, 48:00-48:20)

**D.** Moments later, the two young men originally seen walking toward Albany Avenue come sprinting down the opposite side of Dean Street (the side closest to where the shooting

occurred) away from Albany Avenue. They do not look behind them at any point. (Camera 9, 48:20-48:30)

**E.** The two young men, still running, cross Dean Street to the north side of the street and keep running toward Troy Avenue (toward Weeksville). The young man in the white t-shirt and dark pants is holding his right arm straight down by his side and slightly away from his body as he runs and appears to be holding something in his hand. (Camera 8, 28:38-28:55)

**F.** The two older men, who had previously changed direction to walk away from Albany Avenue, now come back into frame walking quickly toward Albany Avenue and away from Weeksville while repeatedly glancing back over their shoulders in the direction the two young men just ran. (Camera 9, 48:33-48:55)

110.    A handwritten note torn from what appears to be a detective's spiral notebook was stapled to the DVD of the videos in the People's file. The note does not have any detective's name. CRU showed the note to Det. Hutchison, who did not recognize the handwriting. The note states:

> Video
> Camera #8
>         2357 until 2414
>
> Camera # 9
>         4135 until 4220
> 1529 Dean St.

111.    When compared to the video, the time frames listed for both cameras do not capture all of the actions of the young man in the white shirt, as described above. (*see* above,¶109) Nor do they capture any of the reactions of the two older men on the street, or the two young men running back from Albany Avenue. (*see* above, ¶109)

112.    **The Stills From the Video**: The CRU found three stills in the FOIL file. The stills depict two individuals walking down the street, as the prosecutor told the trial court. It is apparent that the stills were taken from Camera 8, from 23:57 until 24:14 as reflected in the detective note. The

prosecutor twice represented to the trial court that the stills represented the entirety of the videos. (T.4) CRU's review of the videos, described above, shows that this is incorrect.

**Relevant CRU Interviews**

113. Mr. Zakari told CRU the following:

**A.** The shooter was wearing a long t-shirt almost down to his knees and a baseball cap. Later in the interview, Zakari said it was not a baseball cap, but a hat with a brim. The shooter came from the direction of Dean Street. Zakari did not pay attention at that time. The shooter fired three times. Two shots hit the deceased and the third hit the wall. The shooter turned and ran away. The shooter was alone. Zakari did not see anyone at the corner.

**B.** A few days before the lineup, detectives told him, Zibo, and Benissan that they "got" the shooter. At the lineup, Zakari was not completely sure about his identification. Zakari identified the person by his profile, and who looked the "most like" the shooter.

**C.** After the lineup, the detectives told him, Zibo, and Benissan they identified "the right guy." The detective told them that they identified Callier's boyfriend, that he fled from the police, and helicopters were required to apprehend him. Zakari had never met her boyfriend and did not know what he looked like.

**D.** A few days after the lineup, Det. Hutchison told him that Callier gave a letter to the police saying that "she believed her boyfriend was the one that killed the deceased" because he fled from the police. Hearing this, and knowing that he, Zibo, and Benissan all identified Callier's boyfriend, Zakari was confident he had selected the right person in the lineup.

**E.**     Zakari initially did not recall testifying at trial. CRU reminded him that he was unable to identify the shooter at trial. He reasoned that the shooter might have changed his appearance.

**F.**     Prior to the shooting. Zakari knew about an altercation and drama between defendant and the deceased. Zakari advised the deceased to avoid Callier. Zakari surmised that the shooter probably aimed at the deceased because the deceased was at the bottom of the stairs by himself.

**G.**     A couple of days after the shooting, neighbors from the building closer to Dean Street said they saw the shooter "walking back and forth, back and forth" prior to the shooting.

**H.**     Zakari did not know Abraham Omar or Kelly Bright. He did not recall being interviewed by a defense investigator.

114.   The CRU interviewed Mr. Benissan. He declined to be recorded but told CRU the following:

**A.**     The shooter came from Dean Street and fled back in that direction. He did not recall if the shooter turned on Dean. He did not see the shooter with anyone else.

**B.**     The shooter was slim and shorter than Benissan, who is 6'1". The shooter appeared to be the same age as him and his friends. Days or months after the lineup, Benissan learned that he identified defendant, Callier's boyfriend, and that defendant was older than them.

**C.**     The deceased did not have any problems in the area.

**D.**     Benissan was certain of his identification of defendant in the photo array. He did not consider defendant's hair because the shooter wore a hat. The detectives did not urge him to identify defendant.

**E.**     CRU showed Benissan the surveillance video, focusing on the two males running back from Albany Avenue. Completely contradicting his identification of Mr. Marshall as the shooter, Benissan said it was weird and they "look like two kids running." He could not say with any certainty that the person in the white t-shirt was the shooter.

115.     During CRU's second interview with Janiqua Callier, CRU played Callier the surveillance footage. She said the video was blurry and she did not recognize anyone. She stated that no one in the video looked like defendant. Everyone looked "husky." Defendant was small and skinny.

116.     The CRU interviewed defense counsel. Counsel stated:

**A.**     Counsel said that if he had had a video with evidentiary value, he would have utilized it. CRU played the video for counsel and showed him the still images. From the video, he could not tell if the male wearing the white t-shirt had a hat on. It appeared to him that the male in the white t-shirt was holding a dark object "right in front of his abdomen" and placed his hand under the t-shirt holding what appeared to be a "black object."

**B.**     He restated that he had never seen any of the footage before and did not recall the still images. Had he seen the video, he would have shown it to defendant, because it could have "flowed" with his alibi ("Out of the ashes comes something"). He would have discussed with defendant whether he was identifiable in the footage. He did not know if he would have used it as evidence, but maybe he could "have made something out of it [the video]." It was "something to work with."

117.     **CRU Analysis**: Arvel Marshall was convicted, under the theory that he acted alone, of shooting the deceased outside his building alongside three eyewitnesses. The eyewitnesses, the deceased's close friends, were all in their 20s, and described the shooter as young, "a kid," between 16 and 21. Arvel was 36. Despite Arvel's repeated demands throughout the trial, he was not provided with a working copy of the surveillance footage and was told in front of the jury that it was irrelevant by the

prosecutor and the trial judge. CRU discovered that the footage showed two young males—the shooter and another individual—on their way to and sprinting back from the shooting location, passing other people in the street. The suppression of this footage was a *Brady* violation and violated defendant's right to due process, and the right to a fair trial. Moreover, the police investigation into everything depicted in the surveillance footage was insufficient. The police apparently never watched all the footage. The photographic stills taken from the footage, which the police provided to the prosecutor, and a detective's note referencing certain segments of the video, do not show the shooter and his companion running back from the direction of the crime scene or the civilians on the street reacting to these events.

## G. The Joint Motion to Vacate and Trial Court's Decision

118.    Following the reinvestigation, on August 9, 2024, Mr. Marshall and District Attorney Gonzalez filed the Joint 440 Motion to vacate the judgment of conviction on the grounds of a *Brady* violation and various due process violations pursuant to CPL Sections 440.10(1)(g) & (h).

119.    Mr. Marshall also moved pursuant to CPL Section 440.10(1)(h) that the video that the state suppressed proved his innocence by clear and convincing evidence. The People did not oppose Mr. Marshall's motion under actual innocence and thereby conceded to his claims.

120.    In the Joint 440 Motion, the District Attorney also moved to dismiss the indictment against all three men pursuant to CPL Section 210.40. The KCDAO acknowledged the following:

A.    Despite the fact that the three eyewitnesses all described the shooter as a kid between the ages of 16 and 21 years old, detectives arrested Mr. Marshall and charged him with the murder. Mr. Marshall was 36 years old at the time.

B.    During the pretrial proceedings the People incorrectly stated they were not in possession of the video. When Mr. Marshall pointed out that the video was mentioned in one of the Police reports, and that he had received the still photos that were produced from the footage, the People acknowledge that there was video but

39

told the Court that they had been unable to play it. The People further told the Court that it was their understanding that the still photos represented everything of significance in the surveillance footage. During the course of the trial Mr. Marshall repeatedly raised the issue of the surveillance footage, and insisted that the People provide the footage claiming that it would demonstrate that he was not the shooter.

C.     During the hearing the CRU admitted that the video depicts the actual shooter and that this footage was never disclosed to the defense. The CRU also conceded that the shooter and the other individual with him were young, thereby eliminating Mr. Marshall as a suspect in the murder of Mr. Oumaria.

## H. The City of New York's Deliberate Indifference to Police and Prosecutorial Misconduct, and Its Failure to Train, Supervise, and Discipline Its Employees

121.    Mr. Marshall's wrongful conviction and imprisonment were not a random miscarriage of justice in an otherwise functioning law enforcement regime. Rather, during the relevant period, policymakers for both the NYPD and the KCDA, acting on behalf of Defendant the City of New York, engaged in the following misconduct, which was reflected, and led to the wrongful conviction, in Mr. Marshall's case: acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; and implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of City officials—including, *inter alia*, to properly document and disclose exculpatory information, and not to fabricate evidence by coercing innocent individuals into making false confessions.

*1. Investigative Reports on Institutional Deficiencies Within the New York City Police Department and the Kings County District Attorney's Office*

122.    Reports from several independent bodies demonstrate that Defendant the City of New York, during the relevant period, was plagued by institutional deficiencies that allowed a wanton and reckless culture to develop within the NYPD and KCDA. This culture allowed employees of the

NYPD and KCDA to violate constitutional rights of the citizens of the City of New York without disciplinary risk or repercussions.

123. On July 7, 1994—just a year and a half before Mr. Marshall's arrest—the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Commission") issued a report (widely referred to as the "Mollen Report") that addressed corruption in the NYPD.[4] The Mollen Report investigated the 1980s and 1990s through the date of the report's publishing. Importantly, the Mollen Report described the state of corruption in the present tense and stated that the Commission's "findings raise significant concerns about . . . the potential for these problems to grow without sustained vigilance and oversight." Mollen Report at 1.

124. The Mollen Report further noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets." *Id.* at 36. The Mollen Report described police falsifications as "probably the most common form of police corruption facing the criminal justice system," *id.*, and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful," *id.* at 41.

125. The Commission noted that it was "not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch," *id.*, and found that "[t]here is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics," *id.* at 41-42. Given this situation, the Mollen Report determined that

---

[4] The Mollen Report is available at http://bit.ly/3qyKkKv.

"successful enforcement of command accountability requires a complete reinvention of the systems for enforcing it." *Id.* at 79.

126.    The Mollen Report concluded that "[o]fficers and their immediate supervisors are not the only culprits in tolerating falsifications  [ T]he Department's top commanders must share the blame." *Id.* at 41.

127.    This Court has already found that the Mollen Report "provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity" and "characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the police commissioner.'" *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014).  Accordingly, this Court has found that "[t]he Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes[.]" *Id.* at 191.

128.    The lack of discipline documented in the Mollen Report continues to this day, as demonstrated by a report released by The Independent Panel on the Disciplinary System of the New York City Police Department (the "Panel"), chaired by the Honorable Mary Jo White, the Honorable Robert L. Capers, and former United States District Court Judge for the Southern District of New York Barbara S. Jones.[5]  The Panel's report (the "Panel Report"), released in January 2019, made specific note of the endemic culture of false testimony in the NYPD, which was repeatedly "brought to the Panel's attention."  Panel Report at 38.

129.    The Panel noted that while "the Patrol Guide provisions . . . expressly forbid officers from lying in connection with their duties, numerous stakeholders have expressed concerns about lax enforcement and practices that enable bad actors to escape accountability and avoid the presumptive termination penalty." *Id.* at 39.  The Panel "share[d] the concern that the Department does not do so

---

[5] The Panel Report is available at https://www.independentpanelreportnypd.net.

and treats false statement cases too leniently," *id.* at 40, particularly as several stakeholders "told the Panel that the Department does not charge officers with making false statements at all when the facts would support such a charge," *id.*, and another "stakeholder told the Panel that certain historic practices may contribute to a culture in which false statements are condoned," *id.* at 41.

130.   Furthermore, in 2009, the New York State Bar Association's Task Force on Wrongful Convictions (the "Task Force") released an investigative report covering 53 cases (the "NYSBA Report").[6] The Task Force found that "government practices" contributed to more than 50% of the wrongful conviction cases studied.   NYSBA Report at 19.  These practices included: (a) the use of false evidence; (b) the failure of the prosecutor to disclose *Brady* material; and (c) "the early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime."  *Id.* All three of these practices contributed to Mr. Marshall's wrongful conviction, where: (a) Mr. Marshall's conviction was based solely on his misidentification procured by Defendants Wolsky and Hutchison; (b) the prosecution withheld from the defense the exculpatory video; and (c) the police immediately identified Mr. Marshall as a suspect based upon information that was unconfirmed and uncorroborated.

131.   The Task Force recommended that police and prosecutors be trained and supervised in the application of *Brady* and truthful evidence rules.  *Id.* at 37-38.  Indeed, the Task Force observed that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show [that *Brady* violations] still occur[]."  *Id.* at 26 (collecting New York cases).  The Task Force therefore suggested that, to the extent not already in existence, prosecutor's offices should implement internal procedures for preventing *Brady* and truthful evidence rule violations, for evaluating whether a prosecutor has engaged in misconduct, and for imposing sanctions for any such misconduct.

---

[6] As noted in the NYSBA Report, available at http://bit.ly/3OVlxtf, the cases spanned from 1964 to 2004, a forty-year period that ends just before Mr. Marshall' arrest in 2008 and conviction in 2009.  Most of the cases were from New York City.  Many were from Brooklyn.  NYSBA Report at 186.

*Id.* at 29. The Task Force also noted the importance of the police in upholding *Brady* obligations, given that "[p]rosecutors' access to exculpatory evidence known to the police depends ultimately on the willingness of the police to record, preserve, and reveal such evidence." *Id.* at 37-38.

132.    As discussed below, despite the significance of the *Brady* rule, neither the NYPD nor the KCDA had appropriate training, supervisory, or disciplinary procedures in place in the time leading up to Mr. Marshall's arrest, indictment, trial, or post-conviction litigation.

133.    The state of New York law enforcement community has acknowledged that there were significant problems with misidentifications and changed the procedures with regard to identification procedures. This **admission** by the NYPD that their procedures were inherently suggestive was not made until **2017**. *See Identification Procedures: Photo Arrays and Line-ups Municipal Police Training Council Model Policy and Identification Procedures Protocol and Forms Promulgated by the Division of Criminal Justice Services Pursuant to Executive Law 837* (21) (June 2017).

134.    On July 9, 2020, the KCDAO conducted a study with regard to 25 wrongful convictions. *See 426 Years: An Examination of 25 Wrongful Convictions in Brooklyn, New York* (July 9, 2020)[7]. The report detailed, of the 25 exonerations that were studied, *72%* had police misconduct, *84%* had prosecutorial misconduct *other than Brady/Giglio* disclosures, and 40% were the product of *Brady* violations. Strikingly, police and prosecutorial misconduct was *almost double* the next highest cause of wrongful convictions. That is precisely what happened in Arvel Marshall's case.

### 1. The City of New York has a Demonstrated History of Police Misconduct through the actions of Detectives Louis Scarcella and Stephen Chmil

135.    Scarcella openly bragged, in a 2007 episode of the *Dr. Phil* television show, that he did not "play by the rules" as a homicide detective.

136.    Through the years, Scarcella has admitted under oath to attaching dollar bills to his business card, which he said helped to get tips on crimes; habitually writing suspects' confessions in his

---

[7] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/http://www.brooklynda.org/wp-content/uploads/2020/07/KCDA_CRUReport_v4r3-FINAL.pdf.

own hand because he "found that it makes them very uncomfortable" to do so themselves; and lying to suspects that he had evidence he did not, in fact, have—all plainly dubious practices.

137.    In July 2019, in a Kings County Supreme Court hearing to overturn Eliseo DeLeon's murder conviction, Chmil testified that he and Scarcella "used some questionable tactics."

138.    After Scarcella and Chmil were caught on video in 1992 removing an informant from jail for an unauthorized outing to meet his girlfriend, go shopping, and dine in restaurants, Chmil admitted that he and Scarcella "shouldn't have done it" and that "[i]t was improper."

139.    In 2000, Neil Ross, a New York criminal court judge and former prosecutor, posted on an internet cigar-smokers forum about how Scarcella helped him secure the murder conviction of Robert Hill, in large part through an eyewitness identification by Teresa Gomez, a habitual drug user Judge Ross himself viewed as incredible.  Reminiscing about a cigar he received from the "legendary detective" Scarcella as they celebrated Hill's conviction in a bar, Judge Ross wrote in his post that Gomez was "a woman who was even then ravaged from head to toe by the scourge of crack cocaine." He further wrote that "[i]t was near folly to even think that anyone would believe Gomez about anything, let alone the fact that she witnessed the same guy kill two different people."

140.    In 2014, at a hearing where the Kings County Supreme Court granted a joint motion by Mr. Hill and the KCDA to vacate Mr. Hill's conviction, a prosecutor from the CRU described Gomez as an "extremely problematic witness" and "a troubled young person, hopelessly addicted to drugs, criminal in her conduct for the most part, increasingly erratic in terms of her accounts."

141.    Notwithstanding clear signs of her extreme unreliability as a witness, Scarcella used Gomez as a witness in at least *six* separate murder cases.  In addition to Mr. Hill, at least two other men identified by Gomez—Mr. Hill's half-brothers Darryl Austin and Alvena Jennette—have had their convictions cleared after the CRU reinvestigated the Scarcella-related cases and determined that Gomez was not credible.

142.     Chmil likewise hinged his cases on unreliable witnesses who were heavily addicted to drugs and easy to manipulate.

143.     Chmil was the lead detective on a homicide case that resulted in the 1987 conviction of Valance Cole. Cole's conviction was based largely on the testimony of Jeffrey Campbell, an individual addicted to crack cocaine who had been arrested earlier for a separate robbery. Years later, while dying from AIDS, Campbell recanted and said that Chmil promised that his robbery charges would be dropped if Campbell testified against Cole. Chmil, Campbell said in a sworn statement, went so far as to give Campbell a script.

144.     In 2003, a judge denied Cole's motion to vacate his conviction but found that Cole was "probably innocent." In addition, another suspect has come forward and confessed to the crime in detail no fewer than four times since 2007.

145.     Chmil has conceded the similarity between Campbell and Gomez (the witness Scarcella used repeatedly in his cases), stating that "Campbell was a lot like her" and that "[s]ometimes he'd tell you the truth, sometimes he wouldn't."

146.     An investigation by the KCDA showed that Defendants Scarcella and Chmil also made a habit of withholding reports for weeks if they did not want prosecutors or defense lawyers to know about a particular suspect.

147.     These are indicia of unprincipled detectives. Indeed, allegations over the last several years indicate that Defendants Scarcella and Chmil engaged in a pattern of corrupt, unconstitutional, and dishonest police practices.

148.     Given their notoriety and the number of known instances of misconduct that occurred in the presence of other police officers and supervisors—some of whom participated in the misconduct with Defendants Scarcella and Chmil—it is a near certainty that the NYPD knew of their deliberate or reckless conduct and either encouraged it or failed to train, supervise, or discipline for said conduct.

149.     City officials outside the NYPD also were aware of Defendants Scarcella's and Chmil's misconduct but remained willfully blind to it.  Indeed, a top prosecutor in 2013 disclosed that even those who respected Scarcella became skeptical of him after, as discussed above, he was caught on video in 1992 removing an informant from jail for an unauthorized outing.  KCDA officials have acknowledged, however, that they mostly kept quiet about their concerns, given Scarcella's popularity with their supervisors.

150.     This enabling culture, albeit with other police officers, permitted and caused the wrongful prosecution and conviction in Mr. Marshall's case.

151.     Defendant Scarcella himself testified during the CPL Section 440.10 motion hearing of Shabaka Shakur (who succeeded on his claim that Scarcella fabricated Mr. Shakur's confession) that there was essentially no oversight and supervision of Brooklyn homicide detectives in the 1980s: they could take cases as they wished and investigate them in whatever manner they desired.  Scarcella thus admitted that the NYPD maintained a laissez-faire policy, pattern, practice, and custom when it came to its homicide detectives.  Their constitutional violations would go unmonitored, unchecked, and undisciplined.

### 2.     Louis Scarcella and Stephen Chmil Were Not the Only Police Officers Conducting Themselves In this Manner. There Are Plenty of Other Case Studies in Improper Police Conduct Just Like Mr. Marshall's case.

152.     Importantly, Scarcella Chmil are isolated cases of a detectives gone rogue. Additional proof of a culture of unconstitutional conduct in the NYPD at that time exists in the voluminous record of other Brooklyn cases—not involving Scarcella or Chmil—that demonstrates that other Brooklyn homicide detectives felt free to act similarly.  This pattern of behavior beyond Scarcella and Chmil supports a clear inference that unscrupulous tactics were considered normal, acceptable, and encouraged within the Brooklyn homicide squad, as demonstrated in the following cases:

**A.     David McCallum and Willie Stuckey:** In October 1985, Brooklyn Detective Joseph Butta allegedly coerced false confessions from David McCallum and Willie Stuckey

through the use of physical intimidation, including slapping Mr. McCallum in the mouth and drawing blood; threats of physical intimidation, including picking up a chair and threatening to hit Mr. McCallum across the head with it; and promises of leniency, including telling Mr. Stuckey that he could go home if he only cooperated ("Q. And what did he tell you would happen to you if you said those things? A. He told me he was going to call my house and he's going to let me go."; "Q. And right after you made the tape, did you think you were going home? A. Yes."). Both men recanted immediately and, tellingly, both confessions contained inconsistencies, false fed facts, and fabrications. Messrs. McCallum's and Stuckey's motions to vacate their convictions were granted on October 15, 2014, absent objection from the KCDA.

B. **Antonio Yarbough and Sharrif Wilson:** On June 18, 1992, 18-year-old Antonio Yarbough came home to find that his mother, 12-year-old sister, and 12-year-old family friend had been savagely tied up, stabbed, garroted with electrical cords, and murdered. Mr. Yarbough, who reported the crime to the police, and his 15-year-old friend Sharrif Wilson, confessed to the murders later that day. Each was convicted (in Mr. Yarbough's case after a second trial, the first ending in a mistrial) and served nearly 22 years in prison before DNA evidence ruled both men out as the perpetrators. In 2014, a Kings County Supreme Court Justice granted their motion to vacate, absent objection from the KCDA. According to a federal civil rights complaint filed by Mr. Yarbough, the NYPD allegedly used a combination of physical and psychological coercive techniques to secure the confessions, the latter including sleep deprivation, false evidence ploys, and false promises of leniency, including allegedly telling Mr. Wilson that they would let him go home if he would only tell them what they wanted to hear.

C. **Colin Warner:** Colin Warner was convicted in 1982 of the 1980 fatal shooting of Mario Hamilton. The victim's brother, Martell Hamilton, asserted that a member of the NYPD pressured him into picking out a photograph of Mr. Warner as someone he may have seen near the scene of the crime. Mr. Warner's motion to vacate his conviction was granted in 2001, absent objection from the KCDA.

D. **Barry Gibbs:** Barry Gibbs was convicted in 1988 of the murder of Virginia Robertson. Mr. Gibbs was exonerated in 2005 after the sole eyewitness, David Mitchell, recanted his line-up and trial identifications of Mr. Gibbs. Mitchell asserted that NYPD Detective Louis Eppolito had threatened his family if he did not identify Mr. Gibbs.

E. **Derrick Deacon:** Derrick Deacon was convicted in 1989 of the murder that same year of Anthony Wynn. Colleen Campbell was an eyewitness who saw the shooter in the hallway of the apartment building where the shooting took place, and who gave a physical description of him to the NYPD. When the NYPD identified Mr. Deacon as a suspect, Campbell told police the shooter was not Mr. Deacon, a man she knew from the neighborhood. Although she was called as a defense witness at trial to testify to that effect, she wavered on the stand and said she could not be sure. Years later, she testified in exoneration proceedings that the NYPD pressured her prior to her testimony, threatening her with the loss of her children if she did not cooperate with them. Although Mr. Deacon lost his motion to vacate at the Supreme Court level, the Appellate Division reversed, the case was re-tried in 2013, and he was acquitted.

F. **Jonathan Fleming:** Jonathan Fleming was convicted in 1990 of the 1989 fatal shooting of Darryl Rush. Jacqueline Belardo, a key prosecution witness, testified at Mr. Fleming's trial that she witnessed the shooting and recognized Mr. Fleming as the shooter. That testimony was false. Belardo later recanted her testimony and asserted that she agreed to identify Mr. Fleming at trial only after police officers threatened her with jail time on an unrelated felony larceny charge. Her recantation was corroborated by evidence of that larceny arrest and the charge's subsequent dismissal. Mr. Fleming's motion to

48

vacate his conviction was granted in 2014 absent objection from the KCDA.

153.     Criminal and civil cases demonstrating the unconstitutional patterns, policies, customs,

and usages of the NYPD include numerous cases in which the NYPD violated its *Brady* obligations,

and the NYPD turned a blind eye to officer dishonesty, as demonstrated in the following cases:

A.     *People v. Cortez*, 149 Misc. 2d 886 (Crim. Ct. Kings Cty. 1990) (dismissing indictment after finding that police violated "spirit" of *Brady* by intentionally destroying tape they were court-ordered to preserve, and that KCDA shared responsibility in tape destruction);

B.     *People v. Moss*, 176 A.D.2d 826 (2d Dep't 1991) (reversing drug sale conviction and ordering new trial for *Rosario* violations, where officers lost or destroyed pieces of paper providing contemporaneous description of seller);

C.     *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992) (ordering new trial for *Brady* violations, where prosecution withheld police report providing description of suspect that did not match defendant's and that "was wholly at odds with the testimony given by [the arresting officer]");

D.     *People v. Nikollaj*, 155 Misc. 2d 642 (Sup. Ct. Bronx Cty. 1992) (ordering new trial for *Rosario* violations, where police failed to turn over numerous inconsistent statements of complainant officers);

E.     *People v. Dunn*, 185 A.D.2d 54 (1st Dep't 1993) (reversing conviction in part where, among other things, detective destroyed his investigative notes);

F.     *People v. White*, 200 A.D.2d 351 (1st Dep't 1994) (reversing conviction where police report containing *Brady* and *Rosario* material was withheld and only discovered through defendant's post-conviction Freedom of Information Law requests to NYPD and Bronx County District Attorney's Office);

G.     *People v. Morrow*, 204 A.D.2d 356 (2d Dep't 1994) (reversing conviction where significant portion of police report was not disclosed);

H.     *People v. Brogdon*, 213 A.D.2d 418 (2d Dep't 1995) (reversing conviction where NYPD sergeant destroyed his notes, and where identification by undercover officer "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive");

I.     *People v. Joseph*, 86 N.Y.2d 565 (1995) (reversing conviction and finding adverse inference instruction to be appropriate where police deliberately destroyed envelopes into which officers had placed cocaine vials seized from defendant);

J.     *People v. Anderson*, 222 A.D.2d 442 (2d Dep't 1995) (reversing conviction where officer's scratch notes were lost or destroyed due to officer's "lack of due care");

K.     *People v. White*, 232 A.D.2d 436 (2d Dep't 1996) (reversing conviction where officer lost his memo book through lack of due care);

L.     *People v. Jackson*, 237 A.D.2d 179 (1st Dep't 1997) (reversing conviction where police withheld Internal Affairs Division reports containing entries "that were significantly at variance with the prosecution's evidence at trial and were clearly evidence that was favorable to the accused");

M.     *People v. Gallman*, 240 A.D.2d 512 (2d Dep't 1997) (reversing conviction for failure to disclose notes of police interview with prosecution's key witness);

N.     *Gurley v. City of New York*, 95-CV-2422 (E.D.N.Y.): Settled in 1997 for $1,750,000, where conviction obtained in 1972 was vacated over 20 years later based on prosecutor's

withholding of exculpatory evidence, including NYPD ballistics report; complaint alleged that NYPD had longstanding policy of deliberate indifference to constitutional requirements that exculpatory evidence be preserved and disclosed to defendants;

**O.**    *Napoli v. City of New York*, 97-CV-1255 (E.D.N.Y.): Settled in 1999 for $60,000, where plaintiff was arrested on weapons possession and assault charges based on false grand jury testimony by NYPD officers; complaint alleged *Monell* theory of liability based on City's deliberate indifference to constitutional obligations of NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights;

**P.**    *Jefferson v. City of New York*, 98-CV-1097 (E.D.N.Y.): Settled in 1999 for $175,000, where plaintiff corrections officer was arrested on drug charges without probable cause, and charges remained pending for five months before grand jury returned no true bill; complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during prosecution;

**Q.**    *Sweazie v. City of New York*, 99-CV-419 (E.D.N.Y.): Settled in 1999 for $20,000, where plaintiff was arrested on weapons possession charges, prosecution continued based on NYPD officers' false statements in felony complaint, and charges were dismissed when grand jury voted no true bill;

**R.**    *Crespo v. City of New York*, 93-CV-8847 (S.D.N.Y.): Settled in 1996 for $25,000, where plaintiff was arrested without probable cause on weapons possession charges; complaint alleged *Monell* claim based on NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals";

**S.**    *Gordon v. City of New York*, 97-CV-8035 (S.D.N.Y.): Settled in 1998 for $40,000, where plaintiff was arrested without probable cause based on false allegations in felony complaint made by NYPD officers, and charges were dismissed by prosecutor three months after arrest; and

**T.**    *Lovell v. City of New York*, 00-CV-2 (S.D.N.Y.): Settled in 2000 for $40,000, where plaintiff was arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint; complaint alleged *Monell* theory of liability based on City's deliberate indifference to constitutional obligations of NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to Internal Affairs Bureau and Civilian Complaint Review Board.

154.    In the early 1990s, the New York City Comptroller's Office, under then-Comptroller Elizabeth Holtzman, conducted a study of police misconduct settlements by the City to assess whether credible claims of police misconduct led to disciplinary action by the NYPD. The study confirmed that the NYPD systematically failed to take corrective action in response to credible claims of police misconduct.

> **3.**    *Former District Attorney Charles Hynes's Deliberate Indifference to the Prosecutorial and Investigative Misconduct Occurring in His Office*

155.    During the relevant period, misconduct by the NYPD went hand in hand with misconduct by the KCDA.

156.    Indeed, the post-conviction litigation of *Collins v. City of New York*, 11-CV-766 (E.D.N.Y.), revealed that at the time of Mr. Marshall's arrest and conviction, the KCDA had no procedure in place to discipline prosecutors for violating their *Brady* obligations.  It further revealed that the KCDA was deliberately indifferent to or endorsed *Brady* violations generally. The *Collins* case concerned *Brady* violations in the KCDA in 1994 and 1995.  Post-conviction discovery revealed that District Attorney Charles Hynes—the same District Attorney in charge of the office when Mr. Marshall was prosecuted—protected instead of disciplined ADAs when their misconduct was discovered.

157.    Hynes first became District Attorney on January 1, 1990.  In the *Collins* case, he and others admitted that the only disciplinary procedure in place for *Brady* violations was for Hynes to personally review the appellate decision to decide if discipline was warranted.  Hynes and other KCDA executives could not identify a single instance of a prosecutor being disciplined during Hynes's entire 24-year tenure.

158.    At the time of Mr. Marshall's prosecution, former DA Hynes, as the manager, chief administrator, and policymaker of the KCDA, a City agency, created and/or maintained policies, customs, and practices of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (a) manufacturing false and misleading evidence and testimony; (b) knowingly presenting false testimony and arguments at criminal proceedings; (c) suppressing *Brady* information; (d) unlawfully arresting, imprisoning, and coercing witnesses; (e) abusing court process; and (f) covering up these unlawful practices.

159.    These policies, customs, and practices have led the Second Circuit and numerous courts within this District to recognize analogous § 1983 *Monell* claims brought by other wrongfully

51

convicted persons. *See, e.g.*, *Walker v. City of New York*, 974 F.2d 293, 300-01 (2d Cir. 1992) (reversing district court's dismissal of *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 441-43 (E.D.N.Y 2015) (denying City's summary judgment motion on *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (denying City's motion to dismiss *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights).

160.    These policies, customs, and practices persisted from former DA Hynes's induction as District Attorney in 1990 through (and, in certain respects, beyond) the end of his tenure as District Attorney in 2013.

161.    Former DA Hynes, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the KCDA.

162.    These policies, customs, and practices proximately caused the violations of Mr. Marshall's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

163.    Former DA Hynes's policy and practice was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of *Brady* information. Former DA Hynes's deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Mr. Marshall's case.

164.    Under former DA Hynes's office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to refrain from making any record of *Brady* information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense,

even though disclosure of such information was and is constitutionally required regardless of whether the information was recorded in written form.

165. Former DA Hynes's training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

166. Prosecutors and investigators were trained on avoiding the creation of *Brady* and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize non-disclosure by subjectively assessing the information as "unreliable" or "incredible," and encouraged to cover up *Brady* information kept hidden by other members of the KCDA.

167. Prosecutors were permitted and encouraged not to comply with the KCDA's ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and through Freedom of Information Law requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the KCDA and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

168. Prosecutors, in violation of *Brady*, were permitted or encouraged to refrain from disclosing pressure tactics, promises, and rewards used to influence witnesses.

169. Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), former DA Hynes encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements. To the contrary, prosecutors who violated defendants' due process rights were promoted, praised, given pay raises, and otherwise endorsed by former DA Hynes and his Office.

170. Former DA Hynes had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other constitutional violations by prosecutors or investigators. In fact, there was no such process or penalty.

171.    Despite dozens of court decisions finding that prosecutors had wrongfully withheld information, in violation of *Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in conduct that misled courts, juries, defendants, and defense attorneys, none of the prosecutors involved was disciplined.

172.    Stunningly, not once during his 24 years in office did former DA Hynes terminate a KCDA prosecutor for prosecutorial misconduct.

### 4.    The Ample Notice to Former District Attorney Charles Hynes of the Prosecutorial and Investigative Misconduct Occurring in His Office

173.    Examples of court decisions that put former DA Hynes on notice of the unlawful conduct being committed by his prosecutors and investigators, before such unlawful conduct led to Mr. Marshall's false conviction, include:

A.    *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (upholding *Monell* claim against City of New York for unlawful policies of KCDA that allegedly resulted in withholding of *Brady* material causing plaintiff's wrongful conviction and 19-year imprisonment);

B.    *People v. Vilardi*, 150 A.D.2d 819 (2d Dep't 1989) (vacating conviction based on prosecutor's failure to turn over exculpatory police report);

C.    *People v. Lugo*, 153 A.D.2d 761 (2d Dep't 1989) (granting motion to vacate conviction based on *Brady* and *Rosario* violations because *Rosario* violation clearly undermined conviction, rendering *Brady* analysis unnecessary);

D.    *People v. Rayford*, 158 A.D.2d 482 (2d Dep't 1990) (reversing conviction and ordering new trial because prosecutor suppressed exculpatory information, and reversing trial court order admitting evidence obtained using suggestive identification procedures);

E.    *People v. Nedrick*, 166 A.D.2d 725 (2d Dep't 1990) (recounting allegations that prosecutor failed to disclose tape-recorded impeachment material);

F.    *People v. Anderson*, 160 A.D.2d 806 (2d Dep't 1990) (observing that prosecutor failed to timely disclose impeachment material);

G.    *People v. Brazzeal*, 172 A.D.2d 757 (2d Dep't 1991) (reversing conviction because, *inter alia*, prosecutor's improper summation violated defendant's due process rights);

H.    *People v. Faison*, 176 A.D.2d 752 (2d Dep't 1991) (observing that prosecutor failed to timely disclose witness's prior statement);

I.    *People v. Crespo*, 188 A.D.2d 483 (2d Dep't 1992) (affirming mistrial grant due to prosecutor's *Brady* violation);

J.    *People v. Brown*, 187 A.D.2d 437 (2d Dep't 1992) (noting that trial court sanctioned prosecutor for delayed production of *Brady* material);

K.    *People v. Cecora*, 186 A.D.2d 215 (2d Dep't 1992) (vacating conviction and ordering new trial because prosecution and police failed to disclose interview notes containing potential impeachment information);

L.    *People v. Hughes*, 181 A.D.2d 912 (2d Dep't 1992) (ordering trial court to hold hearing

regarding prosecution's failure to disclose exculpatory police report);

**M.** *People v. Inswood*, 180 A.D.2d 649 (2d Dep't 1992) (acknowledging prosecution's failure to turn over *Brady* material);

**N.** *People v. Lebron*, 184 A.D.2d 784 (2d Dep't 1992) (reversing conviction because prosecution presented false testimony from police officer that was "completely unbelievable and untrustworthy");

**O.** *People v. Jackson*, 198 A.D.2d 301 (2d Dep't 1993) (affirming vacatur of conviction and new trial order because prosecutors failed to timely disclose exculpatory statements, and noting evidence that prosecutor destroyed notes of interview with witness who ultimately provided exculpatory testimony);

**P.** *People v. Gurley*, 197 A.D.2d 534 (2d Dep't 1993) (affirming trial court's grant of post-conviction motion arising from KCDA's suppression of *Brady* information);

**Q.** *People v. Stevens*, 199 A.D.2d 441 (2d Dep't 1993) (noting that prosecution improperly withheld *Brady* and *Rosario* material);

**R.** *People v. Cortez*, 149 Misc. 2d 886 (Sup. Ct. Kings Cty. 1990) (dismissing complaint because intentional destruction of tape containing impeachment material violated court order and constituted *Brady* violation); and

**S.** *People v. Young*, 155 Misc. 2d 878 (Sup. Ct. Kings Cty. 1992) (ordering new trial because of failure to disclose impeachment material and finding that prosecution witnesses offered "tailored" testimony).

### 5. *Examples of the Kings County District Attorney's Office's Unlawful Policies, Practices, and Customs*

174. Examples of former DA Hynes's ongoing policies and practices of encouraging, authorizing, and/or permitting misconduct by his prosecutors and investigators, include:

**A.** *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) (reversing denial of habeas petition where prosecutor suppressed *Brady* material and misled defense counsel regarding crucial witness);

**B.** *Boyette v. LeFevre*, 246 F.3d 76 (2d Cir. 2001) (reversing denial of habeas petition where prosecutors suppressed *Brady* material);

**C.** *People v. Scott*, 667 N.E.2d 923 (N.Y. 1996) (observing that prosecution failed to disclose statement regarding polygraph result that had been specifically requested by defendant);

**D.** *People v. Bond*, 735 N.E.2d 1279 (N.Y. 2000) (ordering new trial where prosecution failed to disclose prior unrecorded statements to police by prosecution's main witness that she did not see shooting about which she provided "eyewitness" testimony);

**E.** *People v. Calabria*, 727 N.E.2d 1245 (N.Y. 2000) (ordering new trial where prosecutor repeatedly defied court's ruling and made false or misleading argument to jury);

**F.** *People v. Jenkins*, 774 N.E.2d 716, 720-22 (N.Y. 2002) (Kaye, C.J., dissenting) (observing that prosecutor's delayed midtrial disclosure of ballistics report "blind sided" defense);

**G.** *People v. Fuentes*, 907 N.E.2d 286 (N.Y. 2010) (observing that prosecutor improperly withheld portion of medical records containing potentially favorable evidence for defense);

**H.** *People v. Khadaidi*, 201 A.D.2d 585 (2d Dep't 1994) (reversing conviction because prosecution failed to disclose interview notes with complainant containing prior inconsistent statement);

**I.**   *People v. Alvarado*, 201 A.D.2d 486 (2d Dep't 1994) (affirming order vacating conviction and ordering new trial because prosecution failed to disclose police reports containing impeachment material);

**J.**   *People v. Barnes*, 200 A.D.2d 751 (2d Dep't 1994) (observing that prosecutor neither recorded nor disclosed eyewitness's recantation);

**K.**   *People v. Bramble*, 207 A.D.2d 407 (2d Dep't 1994) (upholding sanctions for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request);

**L.**   *People v. Roberts*, 203 A.D.2d 600 (2d Dep't 1994) (reversing conviction where prosecution delayed by one year in disclosing exculpatory witness statement, by which time witness could not be located prior to trial);

**M.**   *People v. Scott*, 216 A.D.2d 592 (2d Dep't 1995) (finding that prosecutor improperly suppressed reports, including polygraph results indicating key witness was withholding information);

**N.**   *People v. Rahman*, 231 A.D.2d 745 (2d Dep't 1996) (remitting for hearing concerning prosecution's apparent improper failure to produce eyewitness informant);

**O.**   *People v. Perkins*, 227 A.D.2d 572 (2d Dep't 1996) (noting that prosecutor failed to timely disclose, *inter alia*, cooperation agreement with witness);

**P.**   *People v. Callendar*, 227 A.D.2d 499 (2d Dep't 1996) (vacating conviction and ordering new trial due to prosecutor's failure to turn over notes of detective's prior statement);

**Q.**   *People v. Bruce*, 224 A.D.2d 438 (2d Dep't 1996) (ordering new trial because of prosecutor's failure to produce police reports containing impeachment material);

**R.**   *People v. LaSalle*, 243 A.D.2d 490 (2d Dep't 1997) (ordering new trial because of prosecutor's "blatant misrepresentation of the facts" during summation);

**S.**   *People v. Gourgue*, 239 A.D.2d 357 (2d Dep't 1997) (reversing conviction and ordering new trial because prosecutor recorded complainant's statements in question form to "circumvent" disclosure obligation);

**T.**   *People v. Hill*, 244 A.D.2d 572 (2d Dep't 1997) (affirming order sanctioning prosecutor for *Rosario* violation);

**U.**   *People v. Gramby*, 251 A.D.2d 346 (2d Dep't 1998) (observing that prosecutor suppressed and failed to timely disclose 911 tape);

**V.**   *People v. Campbell*, 269 A.D.2d 460 (2d Dep't 2000) (reversing conviction and dismissing charge where prosecutor improperly suppressed tape-recorded statement by complainant);

**W.**   *People v. Maddery*, 282 A.D.2d 761 (2d Dep't 2001) (noting prosecutor's delayed disclosure of 911 tape);

**X.**   *People v. King*, 298 A.D.2d 530 (2d Dep't 2002) (noting prosecutor's delayed disclosure of 911 tape);

**Y.**   *People v. Vielman*, 31 A.D.3d 674 (2d Dep't 2006) (reversing conviction and ordering new trial because prosecutor's summation "rested on a false premise" and was "a blatant attempt to mislead the jury");

**Z.**   *People v. Jones*, 31 A.D.3d 666 (2d Dep't 2006) (ordering new trial where prosecution failed to correct false testimony of key witness and improperly vouched for witness's credibility);

**AA.**   *People v. Thompson*, 54 A.D. 3d 975 (2d Dep't 2008) (observing that prosecutor suppressed *Brady* material indicating someone other than defendant committed crime);

**BB.**   *People v. Ramos*, 166 Misc. 2d 515 (Sup. Ct. Kings Cty. 1995) (vacating conviction and ordering new trial because, due to KCDA policy of not taking notes of witness interviews, trial prosecutor was unaware of information acquired by previously assigned

prosecutors for which court had ordered disclosure);

**CC.** *People v. Davis*, 184 Misc. 2d 680 (Sup. Ct. Kings Cty. 2000) (dismissing indictment because prosecution violated court's order to disclose exculpatory evidence to defense before indictment);

**DD.** *People v. Cannon*, 191 Misc. 2d 136 (Sup. Ct. Kings Cty. 2002) (upholding sanctions against prosecution for failure to preserve surveillance photographs); and

**EE.** *People v. Malik*, 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) (vacating conviction and ordering new trial where prosecution improperly suppressed police report).

175.    Under former DA Hynes's policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

176.    Even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.  No prosecutor was ever reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

177.    To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, former DA Hynes stubbornly defended the propriety of his employees' behavior, thereby ratifying and signaling his tolerance of it.  Personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions—sometimes within weeks or even days of court decisions identifying the misconduct.

178.    High-level KCDA officials have acknowledged in deposition testimony that there was no formal disciplinary procedure or policy for prosecutorial or investigator misconduct committed by KCDA employees, and they were unaware of any prosecutor or investigator ever being disciplined during former DA Hynes's tenure for unconstitutional conduct committed during a criminal investigation or prosecution.  In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

## DAMAGES

179.    This action seeks damages for the period from July 22, 2008 (the date of Mr. Marshall's arrest) through the present.  Defendants' unlawful, intentional, willful, purposeful, deliberately

indifferent, reckless, bad-faith and/or malicious acts, misdeeds, and omissions caused Mr. Marshall to be maliciously prosecuted, unfairly tried, wrongfully convicted, and to endure more than 16 years of wrongful imprisonment, including the physical and mental damage arising therefrom.

180.    Mr. Marshall was 36 years old at the time of his incarceration and was released in 2024 at age 52.

181.    He spent significant portion of his adulthood imprisoned for a crime he did not commit, serving his sentence in various maximum-security prisons throughout New York State.

182.    During his wrongful imprisonment, Mr. Marshall suffered extreme hardships, including, without limitation, physical assault, psychological abuse, extreme degradation, pain and suffering, and the loss of more than 16 years of his life.  Mr. Marshall also lost tremendous opportunities.  He lost the most vital years of his life and precious time with his family and friends, including with his mother, who died during his incarceration. He also suffered a mental breakdown in 2015 because of his incarceration.

183.    As a direct and proximate result of the acts of Defendants, the injuries and damages sustained by Mr. Marshall, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, egregious injury to reputation; permanent loss of natural psychological development;  and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

184. All the alleged acts, misdeeds and omissions committed by Individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of Individual Defendants meets all the standards for imposition of punitive damages.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION 42 U.S.C. § 1983
*Denial of Due Process and Right to a Fair Trial Fabrication of Evidence, and Suppression of Brady Information (U.S. Constitution Amendments V and XIV)*
### Against All Individual Defendants

185. Mr. Marshall repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

186. Individual Defendants, acting knowingly, intentionally, deliberately, with malice, and under color of law, deprived Mr. Marshall of his clearly established rights under the Fifth and Fourteenth Amendments to the U.S. Constitution to due process and a fair trial. They did so by:

A. manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony by conducting suggestive identification procedures and suggesting to the witnesses that Mr. Marshall committed the murder; and (2) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information.

187. No person of reasonable caution and acting in good faith, having the knowledge and information Individual Defendants had, would have been warranted in concluding that Mr. Marshall was involved in the murder of Mr. Oumaria, such as to support a probable cause determination. Even setting aside their knowledge that they had manufactured evidence and suppressed *Brady* information, Individual Defendants knew or, in the absence of deliberate indifference, recklessness, and gross negligence, should have known that there were numerous reasons for skepticism about the identification. These include but are not limited to: (1) the description of the shooter by the 911

callers; (2) the description of the shooter by the three witnesses; (3) the ability of the witnesses to make an identification based upon the circumstances and environment surrounding the shooting; (4) the surveillance video that effectively eliminated Mr. Marshall as a suspect.

188.    The presumption of probable cause created by the grand jury indictment is overcome by the fact that Mr. Marshall's indictment was secured based on bad-faith police misconduct. Specifically, the suggestive identification and the suppression of highly exculpatory *Brady* material.

189.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that the false and misleading evidence would deprive Mr. Marshall of a fair trial and result in his wrongful conviction and incarceration.

190.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that *Brady* information would be concealed from Mr. Marshall and his attorney.

191.    Individual Defendants' conduct, committed in concert with one another or others, deprived Mr. Marshall of his rights under the Constitution: (1) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading evidence in violation of his rights under the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution; and (2) to timely disclosure of material evidence favorable to the defense under *Brady* in violation of his rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

192.    Individual Defendants' acts and omissions proximately caused the continuation of Mr. Marshall's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

193.    Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Marshall's constitutional rights.

194. Defendants Wolsky's and Hutchison's falsification of evidence, to wit the motive of the crime, identification of Mr. Marhsall, suppression of the video, and arrest of Mr. Marshall without probable cause establishes that they acted with actual malice.

195. Defendants Bennett, Winning and Cannizaro were directly involved in the misrepresentation of the evidentiary value of the video that showed that Arvel Marshall was not involved with the murder of the deceased.

196. Defendants John and Jane Does 1-25 are employees of the NYPD or KCDA who knew of and aided and abetted, and/or failed to intervene to prevent, Defendants Wolsky and Hutchison's falsification of evidence, withholding of evidence and, arrest of Mr. Marshall without probable cause, and denial of Mr. Marshall's right to a fair trial.

197. The prosecution terminated in Mr. Marshall's favor when his conviction was eventually vacated and the indictment against him dismissed.

198. Mr. Marshall was, in fact, innocent of the crime for which he was convicted and incarcerated.

199. Individual Defendants' actions were willful, malicious, oppressive, and reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION 42 U.S.C. § 1983
### *Malicious Prosecution and Denial of Fourth Amendment Rights (U.S. Constitution Amendments IV and XIV)*
### Against All Individual Defendants

200. Mr. Marshall repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

201. Individual Defendants, acting individually and in concert, with malice, under color of law, and knowing that probable cause did not exist to arrest Mr. Marshall and prosecute him for the murder of Mr. Oumaria, caused Mr. Marshall to be arrested, charged, and prosecuted for that crime,

thereby violating Mr. Marshall's clearly established right under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures.

202.     Specifically, Individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known that probable cause did not exist to arrest and prosecute Mr. Marshall, including but not limited to the fact that Mr. Marshall's erroneous identification was the product of suggestion by Wolsky and Hutchison, and this factor as well as additional material exculpatory and impeachment evidence that Individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Marshall.

203.     In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from the grand jury that vitiated probable cause against Mr. Marshall, including but not limited to their having: (1) manufactured false or misleading evidence and testimony by coercing and suggesting Mr. Marshall's false identification by the 3 eyewitnesses; and (2) suppressed *Brady* information, including a video that would have eliminated Mr. Marshall and pointed to other suspects.

204.     Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Marshall's constitutional rights.

205.     Individual Defendants initiated and continued the prosecution against Mr. Marshall without probable cause, in violation of Mr. Marshall's clearly established constitutional rights.  No reasonable officer at the time of Mr. Marshall's prosecution or thereafter would have believed this conduct was lawful.

206.     The prosecution terminated in Mr. Marshall's favor when his conviction was eventually vacated and the indictment against him dismissed.

207.     Mr. Marshall was, in fact, innocent of the crime for which he was convicted and incarcerated.

208.    As a direct and proximate result of Individual Defendants' conduct, Mr. Marshall was maliciously prosecuted, wrongly convicted, imprisoned for nearly 16 years, and suffered the other grievous damages and injuries set forth above.

**THIRD CAUSE OF ACTION 42 U.S.C. § 1983**
***Monell v. Department of Social Services*, 436 U.S. 658 (1978)**
**Against Defendant the City of New York**

209.    Mr. Marshall repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

210.    At the time of Mr. Marshall's arrest and prosecution, the NYPD and KCDA, both agencies of Defendant the City of New York, created and maintained policies, customs, and practices of deliberate indifference to violations by its employees of the constitutional rights of individuals who were investigated and criminally prosecuted, including through: (1) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony; (2) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information; and (3) covering up these unlawful practices.

211.    Years before Mr. Marshall's trial, the Mollen Commission investigated corruption in the NYPD and exposed the NYPD's practice of failing to properly train, supervise, and discipline officers for fabricating evidence, engaging in improper police investigations, and failing to turn over *Brady* material.

212.    This Court has previously found that the Mollen Report provides sufficient evidence to establish that there was an unlawful custom or practice within the NYPD during the period in question. *See e.g.*, *Pipitone*, 57 F. Supp. at 191. Indeed, the investigation of Oumaria's murder, and the resulting conviction of Mr. Marshall, falls within a judicially recognized window wherein the named defendants committed the misconduct that resulted in Mr. Marshall's conviction.

213.    As the Mollen Report found and later reports from the NYSBA and KCDA found, Defendants Wolsky's and Hutchison's misconduct could not have been isolated or unknown within the

63

NYPD. Rather, a laissez-faire NYPD culture, paired with a statistic-obsessed KCDA, allowed

Defendants Wolsky and Hutchison and the other named and unnamed defendants to continuously

violate the constitutional rights of the citizens of New York City, including Mr. Marshall. In Mr.

Marshall's case, Defendants Hutchison and Wolsky manufactured an identification to secure Mr.

Marshall's unlawful arrest, conviction, and imprisonment.

214.    Both men, along with other named and unnamed defendants from the NYPD and

KCDA suppressed the exculpatory video that would have exonerated Mr. Marshall.

215.    The prosecutors' conduct in this case also exemplifies the KCDA's culture during this

period that valued winning over the truth or defendants' constitutional rights. Former DA Hynes has

admitted in litigation that he and high-level KCDA management failed to discipline prosecutors who

were found by appeals courts to have acted improperly by withholding *Brady* material and engaging in

other misconduct. This created a *de facto* policy of immunity from disciplinary action that fostered

prosecutorial misconduct so long as it secured convictions. Such prosecutorial misconduct included,

*inter alia*, suppressing *Brady* information, as in the instant case.

216.    The ADAs prosecuting Mr. Marshall knew that DA Hynes would not only fail to

discipline them, but that he would support them and oppose any attempts to uncover the wrongdoing

of wrongful convictions.

217.    The violations of Mr. Marshall's constitutional rights and his resulting injuries were

proximately and foreseeably caused by conduct, chargeable to the NYPD, the KCDA, former DA

Hynes, and by extension, the City of New York, amounting to deliberate indifference to the

constitutional rights of persons, including Mr. Marshall, subject to arrest and investigation, including:

**A.**    the institution and implementation of inadequate and unlawful policies, procedures, and
customs concerning:
- the duty not to create or use false or misleading evidence, testimony, and
arguments during criminal proceedings, including bail hearings, pretrial
hearings, trials, and post-conviction proceedings;
- the continuing obligation to correct false, inaccurate, incomplete, or
misleading evidence, testimony, statements, and argument, whenever such

misconduct is discovered to have occurred, including moving or consenting to overturn convictions discovered to have been obtained through such unconstitutional means; and

- the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

- the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

218. The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, who knew that such policies, procedures, regulations, practices, and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases.

219. The City knew of the unconstitutional conduct occurring among its employees in light of the numerous credible allegations, many substantiated by judicial decisions, that its employees: (1) wrongfully withheld, lost, or destroyed evidence favorable to the defense that was required to be timely disclosed to the defense under *Brady*; (2) had presented or failed to correct false or misleading testimony and argument; and (3) had abused judicial process to coerce false or inherently unreliable testimonies and statements.

220. Despite this knowledge, the supervisory and policymaking officers and officials of the City perpetuated or failed to take preventative or remedial measures to terminate said policies, procedures, practices, and customs; did not effectively instruct, train, or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and disciplining employees who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and customs, described

above, with deliberate indifference to the effect their actions would have upon the constitutional rights of individuals and citizens of the City and State of New York.

221. The aforesaid policies, practices, and customs of the City were substantial, contributing factors in bringing about the aforesaid violations of Mr. Marshall's rights under the Constitution and laws of the United States and in causing his wrongful conviction and resulting damages.

222. The supervisory and policymaking officers and officials of the City were deliberately indifferent to the manner in which convictions were secured without regard to defendants' constitutional rights or guilt. The violations of defendants' rights were endemic, and the City was aware of these practices but did not take corrective or preventative action to correct it.

### FOURTH CAUSE OF ACTION
### Malicious Prosecution *New York State Law*
### Against All Defendants

223. Mr. Marshall repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

224. Individual Defendants, acting individually and in concert, with malice, and knowing that probable cause did not exist to arrest Mr. Marshall and prosecute him for the murder of Oumaria, caused Mr. Marshall to be arrested, charged, and prosecuted for that crime.

225. Specifically, Individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known that probable cause did not exist to arrest and prosecute Mr. Marshall, including but not limited to the fact that Mr. Marshall's mistaken identification by the three witnesses was the product of improper suggestion by Defendants Wolsky and Hutchison, and this factor as well as additional material exculpatory surveillance evidence that Individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Marshall.

226. In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts

66

from the grand jury that vitiated probable cause against Mr. Marshall, including but not limited to their having: (1) manufactured false or misleading evidence and testimony by suggesting Mr. Marshall's identification; and (2) suppressed *Brady* information that would have pointed to other suspects and eliminated Mr. Marshall.

227.     Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Marshall's constitutional rights.

228.     Individual Defendants initiated and continued the prosecution against Mr. Marshall without probable cause.

229.     The prosecution terminated in Mr. Marshall's favor when his conviction was eventually vacated and the indictment against him dismissed.

230.     Mr. Marshall was, in fact, innocent of the crime for which he was convicted and incarcerated.

231.     Defendant the City of New York is liable under the doctrine of *respondeat superior* for the malicious prosecution of Mr. Marshall by Individual Defendants, all of whom were acting as agents of the City of New York and within the scope of their employment.

232.     As a direct and proximate result of Defendants' conduct, Mr. Marshall was maliciously prosecuted, wrongly convicted, imprisoned for 16 years, and suffered the other grievous damages and injuries set forth above.

### FIFTH CAUSE OF ACTION
### New York State Constitution
*Denial of Due Process and Right to a Fair Trial, Fabrication of Evidence, Suppression of Exculpatory Information, and Malicious Prosecution  (New York State Constitution, Article I, §§ 5, 6, and 12)*
### Against All Defendants

233.     Mr. Marshall repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

234. The acts and omissions described above caused violations of Mr. Marshall's rights under the New York State Constitution, including the rights to due process and to be free from unreasonable searches and seizures, and Mr. Marshall's resulting damages.

235. To the extent that any of Mr. Marshall's claims against one or more Defendants is unavailable under 42 U.S.C. § 1983—including, but not limited to, 42 U.S.C. § 1983's lack of *respondeat superior* liability—Mr. Marshall retains a legal remedy for such claims under the New York State Constitution.

**SIXTH CAUSE OF ACTION**
**Negligence**
*New York State Law*
**Against Defendant the City of New York**

236. Mr. Marshall repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

237. Defendant the City of New York is liable for negligence, having breached its duty of reasonable care to Mr. Marshall.

238. Specifically, and by way of example, the City intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline its agents and employees with regard to the matters described above. The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Mr. Marshall's wrongful conviction and resulting damages.

239. The City's negligence and gross negligence directly and proximately caused Mr. Marshall to be wrongly prosecuted and imprisoned for 16 years.

240. Mr. Marshall was, in fact, innocent of the crime for which he was convicted and incarcerated. Mr. Marshall's cause of action for negligence was unavailable to him until his prosecution finally terminated in his favor, when his conviction was eventually vacated and the indictment against him dismissed. As a direct and proximate result of Defendants' conduct, Mr. Marshall was maliciously

prosecuted, wrongly convicted, imprisoned for 16 years, and suffered the other grievous damages and

injuries set forth above.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Arvel Marshall demands judgment against the above-

captioned Defendants as follows:

a. for compensatory damages to be determined at trial, but in all events no less than $100 million;

b. for punitive damages against each Individual Defendant in an amount to be determined at trial;

c. for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d. for pre- and post-judgment interest as allowed by law; and

e. for such other relief as this Court deems just and proper.


Dated: November 4, 2025
Forest Hills, New York

JUSTIN C BONUS ATTORNEY AT LAW


By: _Justin Bonus_
    Justin Bonus, Esq.
    118-35 Queens Blvd, Suite 400
    Forest Hills, NY 11375
    (347) 920-0160 (Tel)
    (917) 475-0682 (Fax)
    Justin.bonus@gmail.com
    *Attorneys for Plaintiff Arvel Marshall*